EXHIBIT
II

# NOTICE OF CLAIM

**PLEASE PROVIDE COPIES OF THE LAWSUIT (IF APPLICABLE), BUY/SALE AGREEMENT AND ALL CORRESPONDENCE RELATED TO THIS DISPUTE. YOUR CLAIM CANNOT BE PROCESSED WITHOUT THIS INFORMATION!!!!!**

FIRM NAME: _Realty/Pro, Inc. dba: Realty Center_          DATE FIRST NOTIFIED OF CLAIM AND DATE OF SERVICE
¥ _Jon D. Johnson, Agent/ Pres._

AND ADDRESS: _4406 W. Quail Point Cr._          IF LAWSUIT: _5-31-2002_
_Boise, ID. 83703_

TELEPHONE#: _208-343-1186_          DATE OF CONTRACT/CLOSING OR OTHER INSURABLE
FAX#: _208-555-7511_          EVENT: _( 1-12-2000 ? ) UNKNOWN_

PRINCIPAL BROKER: _Jon Roice Designated_          * (If this date precedes your MEDMARC effective date, please
_Corp Broker._          provide proof of your insurance from this date to the date you
became insured by MEDMARC.)

NAME(S) OF AGENT(S) WITH ABOVE REALTY FIRM, WHO WERE INVOLVED IN THE SUBJECT TRANSACTION
[Please include each agent's role (i.e. listing agent, selling agent, property manager, etc.)]:
_Jon Johnson is named in this suit, but never gave or were Plaintiff,_
_Kevin Duesman to the firm has no records regarding this transaction,_
_Terry Johnson - 208-336-0323 (terminated his employment with Realty_
_Center 8-30-1998 and went to work for Park Point - John L.Scott Realty 208-323-4000_

ADDRESS & TELEPHONE NUMBER OF ANY OF ABOVE AGENTS WHO ARE NO LONGER WITH ABOVE FIRM:

NAME(S) OF CLAIMANT(S) [Party making demand]: _KEVIN DUESMAN_
_who is also named in law suit._

SELLER(S) OF SUBJECT PROPERTY (or owners, if property management) AND PROPERTY ADDRESS:
_WARREN FARNSWORTH ASSIGNED PURCHASE CONTRACT TO KEVIN DUESMAN_
_To Buy 5705 SUNSET DRIVE, NAMPA (John L.Scott Realty was Broker.)_

HAS THERE BEEN ANY WRITTEN DEMAND FOR MONEY OR SERVICES PRIOR TO RECEIPT OF CURRENT DEMAND?
YES _____ NO _X_          DATE RECEIVED _____          (IF YES, PLEASE ATTACH COPIES.)

IS THE FIRM OR AGENT INVOLVED IN THIS CLAIM INSURED BY ANOTHER CARRIER (OTHER THAN MEDMARC) FOR REAL
ESTATE ERRORS & OMISSIONS? NO _X_ YES _____     (If yes, please provide a copy of other declaration page and policy)

I HEREBY CERTIFY THAT THE ANSWERS AND STATEMENTS TO THE ABOVE QUESTIONS ARE TRUE AND I HAVE NOT
OMITTED OR MISREPRESENTED ANY INFORMATION. _Realty/Pro, Inc. dba Realty Center._

_____     _9-1-02_
Signature          Date (M-D-Y)

Name & Title (PLEASE PRINT) _Jon D Johnson, President & its individual agent_

MEDMARC MUST RECEIVE WRITTEN NOTIFICATION FROM AN INSURED IMMEDIATELY AFTER CLAIM OR SUIT IS BROUGHT. IF THE INSURED SHA...
IMMEDIATELY FORWARD TO MEDMARC EVERY DEMAND, NOTICE, SUMMONS OR OTHER PROCESS RECEIVED BY THE INSURED OR THE INSURE...
REPRESENTATIVE. THE INSURED SHALL NOT ADMIT ANY LIABILITY, ASSUME ANY OBLIGATION, OR INCUR ANY EXPENSE EXCEPT WITH T...
PRIOR WRITTEN CONSENT OF THE COMPANY. THE INSURED SHALL COOPERATE WITH THE COMPANY.
ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES A STATEMENT OF CL...
CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY F...
MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME.

FAX TO: (502)...
MAIL TO: RICE INSURANCE SERVICES COMPANY, LLC
PO BOX 6709
LOUISVILLE, KY 40206-0709
STREET ADDRESS FOR OVERNIGHT PACKAGES: 421 NORBOURNE BLVD, LOUISVILLE, KY 40207

_CLAIM SENT TO MEDMARC (RICE INS.) THEY GIVED FRONTIER TOLD ME TO CALL BEEN HARDER AT NORTH AMERICAN RISK_





EXHIBIT
JJ

## ANDERSON ULLIAN & HULL LLP

**ATTORNEYS AND COUNSELORS AT LAW**

Robert A. Anderson
Brian K. Julian
Alan K. Hull
Chris H. Hansen
Phillip J. Collaer
Michael P. Stefanic
Natalie C. Mendoza
Randall L. Schmitz

Kenneth D. Nyman
(of Counsel)

Jason G. Murray
Justin P. Aylsworth
Bret R. Hamm
Mark D. Sebastian
Daniel A. Nevala
John L. Sullivan
Paul J. Stark
Kelley K. Fleming

C. W. Moore Plaza
250 South Fifth Street, Suite 700
Post Office Box 7426
Boise, Idaho 83707-7426
Telephone: (208)344-5800
Facsimile: (208)344-5510
e-mail: ajh@ajhlaw.com
Web Site: www.ajhlaw.com
With Attorneys Licensed to Practice in
Idaho, AZ, CO, OR, PA and TX

August 18, 2003

Nick Esterbrook
New York State Insurance Department
Liquidation Bureau
195 Lake Louise Marie Road
Rock Hill, New York 12775-8000

Re:     Claim No.:
        Claimant(s):      Kevin Duesman
        Insured(s):       Jon Adamson/Realty Center
        D/L:
        Trial Date:       December 15, 2003
        Our File No.:     468-37

Dear Mr. Esterbrook:

I am enclosing for your file, a copy of the Order for Dismissal which has been entered by the Honorable Kathryn Sticklen. By virtue of the Order, all claims against your insureds have been dismissed with prejudice. Accordingly, I am today closing my file.

Sincerely,

Phillip J. Collaer

dle
Enclosure

cc/enc:    Jon Adamson

COPY

David S. Perkins, ISB No. 4381
Tyra H. Stubbs, ISB No. 3266
QUANE SMITH LLP
Sixteenth Floor, U.S. Bank Plaza
101 South Capitol Boulevard
P. O. Box 519
Boise, Idaho 83701
Telephone: (208) 345-8600
Facsimile: (208) 345-8660

Attorneys for Defendant Jerry Adamson

IN THE DISTRICT COURT OF
THE FOURTH JUDICIAL DISTRICT
OF THE STATE OF IDAHO, IN AND
FOR THE COUNTY OF ADA

KEVIN DUESMAN, on behalf of himself
and all others similarly situated,

Plaintiffs,

vs.

JON DEE ADAMSON, JERRY
ADAMSON, PARK POINTE REALTY,
INC. dba JOHN L. SCOTT, REAL/PRO
FOUNDATION, INC. and DOES ONE
through ONE HUNDRED, whose true
names are unknown,

Defendants.

Case No. CV OC 0200240 D

ORDER FOR DISMISSAL WITH
PREJUDICE

A Stipulation for Dismissal with Prejudice having duly and regularly come
before this Court, and good cause appearing therefor,

ORDER FOR DISMISSAL WITH...

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, and this does order, adjudge and decree that the above-entitled cause be and the same hereby is dismissed with prejudice and without costs and attorney fees to any party.

DATED this 8 day of August , 2003.

KATHRYN A. STICKLEN

HONORABLE Kathryn A. Sticklen
District Judge

ORDER FOR DISMISSAL WITH PREJUDICE - 2

Case 1:05-cv-00021-BLW   Document 13-9   Filed 10/14/05   Page 5 of 62

CLERK'S CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this ___ day of August, 2003, I served a true and correct copy of the foregoing ORDER FOR DISMISSAL WITH PREJUDICE by delivering the same to each of the following, by the method indicated below, addressed as follows:

| | | |
|---|---|---|
| T.J. Angstman | [X] | U.S. Mail, postage prepaid |
| Wyatt B. Johnson | [ ] | Hand-Delivered |
| Angstman Law, PLLC | [ ] | Overnight Mail |
| 3649 N. Lakeharbor Lane | [ ] | Facsimile |
| Boise, Idaho 83703 | | |
| | | |
| Phillip J. Collaer | [X] | U.S. Mail, postage prepaid |
| Robert A. Anderson | [ ] | Hand-Delivered |
| Anderson, Julian & Hull, LLP | [ ] | Overnight Mail |
| C.W. Moore Plaza | [ ] | Facsimile |
| 250 S.W. Fifth Street, Suite 700 | | |
| P.O. Box 7426 | | |
| Boise, Idaho 83707-7426 | | |
| | | |
| Michael T. Spink | [X] | U.S. Mail, postage prepaid |
| Kelly M. Garrity | [ ] | Hand-Delivered |
| Spink Butler Clapp, LLP | [ ] | Overnight Mail |
| P.O. Box 639 | [ ] | Facsimile |
| Boise, Idaho 83701 | | |
| | | |
| Tyra H. Stubbs | [X] | U.S. Mail, postage prepaid |
| Quane Smith LLP | [ ] | Hand-Delivered |
| 101 S. Capitol Boulevard, 16th Fl. | [ ] | Overnight Mail |
| P.O. Box 519 | [ ] | Facsimile |
| Boise, Idaho 83701--0519 | | |

_____
Clerk

OCT-15-2001 13:25 FROM LIQUIDATION BUREAU 212 791 4237 TO 18457961906 P.02

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: Hon. EDWARD H. LEHNER, Justice

PART 19

Gregory V. Serio

- v -

Frontier Insurance Co.

INDEX NO. 405090/01

MOTION DATE

MOTION SEQ. NO. 001

MOTION CAL. NO.

The following papers, numbered 1 to ______ were read on this motion to/for ______

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | |
| Answering Affidavits — Exhibits | |
| Replying Affidavits | |

Cross-Motion: ☐ Yes ☐ No

Upon the foregoing papers, it is ordered that this motion by petitioner for an order of rehabilitation is granted per decision on record this date.

Order signed.

FILED OCT 15 2001 NEW YORK COUNTY CLERK'S OFFICE

Exh (H) 4/15/05

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE

Dated: OCT 1 0 2001

J.S.C.

Check one: ☐ FINAL DISPOSITION ☐ NON-FINAL DISPOSITION

EXHIBIT KK

At IAS Part 19 of the Supreme Court of the State of New York, County of New York, at the Courthouse, 60 Centre Street, New York, New York on the 10th day of October, 2001.

P R E S E N T :

HON. EDWARD H. LEHNER

JUSTICE

------------------------------------------x

In the Matter of

The Application of

GREGORY V. SERIO, as Superintendent of Insurance of the State of New York, for an order to take possession of the property of and rehabilitate

FRONTIER INSURANCE COMPANY

------------------------------------------x

Index No.: 405040/o/c

ORDER OF REHABILITATION

NEW YORK COUNTY CLERK'S OFFICE OCT 15 2001

Petitioner, Gregory V. Serio, Superintendent of Insurance of the State of New York (the "Superintendent"), having moved this Court for an order to take possession of the property of and rehabilitate Frontier Insurance Company ("Frontier");

NOW, upon reading and filing the order to show cause signed August 27, 2001, the petition of Gregory V. Serio, Superintendent of Insurance, by Kevin Rampe, First Deputy Superintendent, duly verified August 24, 2001 and the emergency affidavit of Kevin Rampe sworn to on August 27, 2001; (the exhibits annexed thereto); the cross motion by Frontier Insurance Group dated September 7, 2001, the annexed proposed petition, the affidavit of Suzanne Loughlin sworn to on September 7, 2001, the exhibits annexed thereto; the affirmation in opposition by Mary Nicholls dated September 7, 2001; the affirmation in opposition by Adam I. Giat dated September 7, 2001; the affidavit of Kevin Rampe sworn to on October 3, 2001, and the exhibits annexed thereto;

OCT-15-2001  13:26  FROM LIQUIDATION BUREAU      TO 18457961906       P.04
212 791 4527

and the reply affidavit of Joseph Termini sworn to on October 3, 2001 and it appearing to my satisfaction that:

1. Frontier was incorporated in New York as a stock property/casualty insurer on November 2, 1962 and commenced business on August 17, 1966;

2. Frontier's principal place of business is located at 195 Lake Louise Marie Road, Rock Hill, New York in Sullivan County. Frontier's tax ID number is 13-2559805;

3. Frontier is subject to the New York Insurance Law and particularly to article 74 thereof;

4. Frontier is insolvent;

5. Frontier has failed to cure its impairment of capital or minimum surplus to policyholders;

6. Frontier has consented to the entry of the order of rehabilitation; and

7. It is in the best interest of Frontier's policyholders, creditors and the general public that the Superintendent be directed to take possession of Frontier's property and to rehabilitate its business and affairs;

And, the Petitioner, having appeared by the Hon. Eliot Spitzer, Attorney General of the State of New York, and due deliberation having been had,

NOW, on motion of Hon. Eliot Spitzer, Attorney General of the State of New York, it is ORDERED as follows:

1. The petition is granted and the cross-motion is withdrawn;

2. Gregory V. Serio, Superintendent, and his successors in office as Superintendent, is appointed Rehabilitator of Frontier and is authorized and directed to immediately take possession of its property, conduct its business, including but not limited to settling claims within his sole discretion, take such steps toward the removal of the causes and conditions which made this proceeding necessary as he shall deem wise and expedient, and deal with the property and business of Frontier in its name or in the name of the Superintendent as Rehabilitator;

2

3. Notice to all persons having claims against Frontier to file or present their claims to the Superintendent as Rehabilitator is deferred until further order of this court.

4. Frontier, its officers, directors, depositories, trustees, agents, servants, employees, and all other persons, having any property or records belonging or relating to Frontier, including, but not limited to insurance policy, loss claim and legal files are directed, upon request of the Superintendent as Rehabilitator to assign, transfer, set over and deliver to him all such property or records;

5. Any persons, firms, corporations, or associations having any books, papers or records relating to the business of Frontier shall preserve them and submit them to the Superintendent as Rehabilitator for examination and copying at all reasonable times;

6. All persons including, but not limited to the officers, directors, shareholders, trustees, agents, servants, employees, attorneys, and managers of Frontier, are enjoined and restrained from the transaction of Frontier's business, the waste or disposition of its property, interfering with the Superintendent as Rehabilitator in the possession, control and management of Frontier's property or in the discharge of his duties;

7. All persons are enjoined and restrained from commencing or prosecuting any actions, lawsuits, or proceedings against Frontier, or the Superintendent as Rehabilitator;

8. All persons are enjoined and restrained from obtaining preferences, judgments, attachments or other liens or making any levy against Frontier's assets or any part thereof.

9. All parties to actions, lawsuits, and special or other proceedings in which Frontier is obligated to defend a party pursuant to an insurance policy, bond, contract or otherwise are enjoined and restrained from proceeding with any discovery, court conferences including but not limited to pre-trial conference, trial, application for judgment or proceedings on settlements or judgments for a period of one hundred and eighty days from the date of entry of this order.

10. Those persons who may have first-party or New York Comprehensive Automobile Insurance Reparations Act (No-Fault) policyholder loss claims against Frontier coming within the purview of Article 76 of the Insurance Law are enjoined from presenting and filing such claims in this proceeding for 90 days from the date of entry of this order.

1

OCT-15-2001 13:26 FROM LIQUIDATION BUREAU TO 18457961906 P.06

212 791 4237

11. In addition to the powers enumerated above and those delegated to the Rehabilitation in the New York Insurance Law, the Rehabilitator, by Order to Show Cause on notice to interested parties, including without limitation Frontier's sole shareholder, and subject to court approval, may sell or otherwise dispose of all or any part of the real and personal property of Frontier, sell any line of insurance, and take such other actions as set forth in Section 7428 of the New York Insurance Law.

12. That the Superintendent of Insurance, as Rehabilitator, may at any time make further application at the foot of this Order to this Court for such further and different relief as he sees fit.

13. All further papers in this proceeding shall bear the caption:

In the Matter of

The Rehabilitation of

FRONTIER INSURANCE COMPANY



E N T E R

_____
J.S.C.

RehOrder 1



F I L E D

OCT 15 2001

NEW YORK
COUNTY CLERK'S OFFICE

## SUPREME COURT : NEW YORK COUNTY

In the Matter of

the Application of

GREGORY V. SERIO, as Superintendent of Insurance of the State of New York, for an order to take possession of the property of and rehabilitate

FRONTIER INSURANCE COMPANY

## ORDER OF REHABILITATION

**ELIOT SPITZER**
Attorney General

Attorney for the Superintendent of Insurance

Office and Post Office Address
120 Broadway, New York, N.Y. 10271

Tel.

Personal Service of a copy of

within...................................................

is admitted this................day of

....................................2001

---

Sir:   Please take notice that the within is a true copy of duly filed and entered in the office of the clerk of County, on the day of .2001

Yours, etc.,

**ELIOT SPITZER**
Attorney General,

Attorney for

Office and Post Office Address
120 Broadway, New York, N.Y. 10271

To:                                     , Esq.

Attorney for

---

Sir:   Please take notice that the within will be presented for settlement and signature to the Hon. one of the Judges of the within named Court, at

In the Borough of City of New York, on the day of

Date, N.Y., ,2001.   Yours, etc.,

**ELIOT SPITZER**
Attorney General,

Attorney for

Office and Post Office Address
120 Broadway, New York, N.Y. 10271

To:                                     Esq.

Attorney for



**EXHIBIT 11**

## Update - Frontier Insurance Companies - October 22, 2002

### Status - Order of Rehabilitation

The situation with Frontier remains unresolved, although much work behind the scenes continues. To recap - - on Oct. 15, the New York Supreme Court entered an Order of Rehabilitation, which allowed the New York Dept. of Insurance to take over Frontier and "rehabilitate its business and affairs."

The immediate effect of that Order is to stop, temporarily, the processing of all Frontier claims until such time as the Superintendent of the New York Dept. of Insurance gives his authority to proceed. This could be any day, or may take weeks. Until that time, however, the third-party claims administrator - RISC Insurance - is without authority to do anything on any Frontier claim, including investigate the claim, deny it, pay or settle it, or provide a legal defense for it.

The good news is that coverage under the Frontier policies continues and is in effect. All claims covered by the policy will be paid - eventually. The Superintendent of Insurance has assured as much.

### If you have a claim.

Licensees with a pending Frontier claim should take note that the "Order of Rehabilitation" specifically prevents any party from pursuing a lawsuit on the claim for 180 days. (A lawsuit can be filed, but no further proceedings on it may be taken.) A copy of that Order is available from the Commission's website, or upon request from the Commission, or from RISC Insurance.

Licensees with questions concerning their coverage with Frontier should call RISC Insurance, at 1-800-637-7319.

### Future claims.

Licensees wishing to avoid the delay as to future claims might consider purchasing another group policy with MEDMARC. (Remember, the policy is a "claims made" policy, and not a "loss incurred" policy, so mistakes that have already been made, but about which no one has yet complained in writing, will be covered). There is no additional coverage with the second group policy, as the terms and conditions of both policies are identical. The only protection that would be purchased with a MEDMARC policy is the guaranty of prompt claims administration. Licensees interested in a purchasing an additional group policy should contact RISC Insurance, directly, at 1-800-637-7319.

### History and Explanation.

IRBC took pro-active steps in attempt to avoid the current inconvenience to its licensees. When Frontier's economic woes became apparent in the Spring of 2000, IRBC compelled the company to obtain "reinsurance," guaranteeing 100% payment of all claims by an "A" rated company (Clarendon). Later, and prior to Frontier's filing for the Rehabilitation Order, IRBC signed off on documents re-assigning its E&O contract to an A rated company, MEDMARC. Any licensee who purchased new group insurance, or who renewed his existing group insurance, on or after September 4, 2001, is insured under the new MEDMARC policy, not Frontier. (Under the reassignment, all of Frontier's existing insureds should have been transferred to MEDMARC; however, the sudden Order of Rehabilitation has prevented that part of the agreement from occurring.)

IRBC knows that delay in New York has caused frustrating to all. Giving some context to the current problem is the fact that the offices for the New York Dept. of Insurance were located a mere two blocks from the World Trade Center, until September 11. The situation there no doubt has impacted that agency's ability to respond to the Frontier case as it otherwise might.

EXHIBIT
MM

Memorandum

To:         Bert Harvey

From:       Harry Keith

Re:         Real Estate E & O Claims with claim date prior to Cut Thru endorsement effective dates

Date:       4/29/02

Per our conversation please find a list of the Real Estate E & O claims I have found so in which the date of the claim being made appears to fall before the effective date of the cut thru endorsement in question:

| Claim # | Old Claim # | State | Claimant |
|---|---|---|---|
| 522002031008 | 5126 | KY | Timothy Coleman |

Notice of claim reports lawsuit served on insured 5/25/00. Cut thru endorsement effective 6/1/00.

| Claim # | Old Claim # | State | Claimant |
|---|---|---|---|
| 522002031004 | 5112 | KY | Jeff & Tracy Nash |

Copy of letter in file shows 1st demand in writing to the insured dated 4/20/00. Cut thru endorsement effective 6/1/00.

| Claim # | Old Claim # | State | Claimant |
|---|---|---|---|
| 522002030812 | 5084 | KY | Roy & Ina Rogers |

Notice of claim reports lawsuit served on insured 5/25/00. Cut thru endorsement effective 6/1/00.

| Claim # | Old Claim # | State | Claimant |
|---|---|---|---|
| 522002030813 | 5082 | ID | Vivienne Hess |

First written notice of demand for payment or services sent to insured dated 4/11/2000. Cut thru endorsement effective 5/10/00.

| Claim # | Old Claim # | State | Claimant |
|---|---|---|---|
| 522002032011 | 5362 | ID | Larry McCluskey |

First written notice of demand for payment or services sent to insured dated 2/152000. Cut thru endorsement effective 5/10/00.

| Claim # | Old Claim # | State | Claimant |
|---|---|---|---|
| 5220020311019 | 5085AA | ID | Warren Farnsworth, et al |
| 5220020311018 | 5085C | ID | Warren Farnsworth, et al |
| 5220020311011 | 5085D | ID | Warren Farnsworth, et al |

These three claims (actually one claim being made against three different insureds) stem from a purported charitable/religious operation the insured was involved in who's goal was to bring together people investing in real estate with families unable to purchase a home of their own.

A previous claim arising from the insureds actions in connection with this same operation was established under claim 5220020411022 (old claim # 5085A). When issuing the ROR letter on the Farnsworth claims Frontier referenced a policy provision which states "All claims arising out of the same or related errors, omissions or negligent acts will be deemed to have been made when the first of such Claims is made" and then went on to say that

"Frontier has determined that this lawsuit arises out of acts which are the same or related to the acts alleged in an earlier lawsuit filed by Doug Stewart and Kelle Watkins against Real/Pro, Inc. and others"

The Stewart/Watkins lawsuit referred to above is old claim 5085A. Therefore, Frontier is taking the position that these three claims have the same date of loss of 5085A (which is closed), which is at least 9/7/99 and possibly earlier. Effective date of the cut thru endorsement is 5/10/00.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

WARREN M. FARNWORTH,          )
                              )
        Plaintiff,            )
                              ) Case No.
vs.                           )
                              ) 05-021---BLW
CLARENDON NATIONAL INSURANCE  )
COMPANY,                      )
                              )
        Defendant.            )
                              )

COPY

Exhibits 1-9

30(b)(6) DEPOSITION OF CLARENDON NATIONAL INSURANCE

TESTIMONY OF HARRY KEITH

July 14, 2005

REPORTED BY:

MARTA M. RICE, CSR No. 722, RPR

Notary Public

Court

M&M Reporting Service, Inc.
Since 1970
Registered Professional Reporters

SOUTHERN 1-800-234-9611
BOISE, ID 208-345-9611
POCATELLO ID 208-232-5581
TWIN FALLS, ID 208-734-1700
ONTARIO OR 503-881-1700
NORTHERN 1-800-829-1700

EXHIBIT NN

## Page 29

1  Q. 2005?
2  A. 2005, yes.
3  Q. Do you know what state he lives in?
4  A. Florida.
5  Q. Do you know what city?
6  A. I believe he's in Longwood. But it's
7  in the Orlando area.
8  Q. Longwood?
9  A. Longwood, one word.
10 Q. Okay. All right. And what did Mr. --
11 what was Mr. Markham's task with regard to the
12 files that were sent over from -- were they sent
13 from Rice?
14 A. I believe they were, but I was not
15 actually employed with NARS at the time in March
16 of 2002.
17 Q. Okay.
18 A. I didn't start my employment with them
19 until April of 2002.
20 Q. Okay. So what was Mr. -- how did
21 Mr. Markham handle those files?
22 A. Mr. Markham was the manager of the --
23 for lack of a better term, the general liability
24 group. He had -- at the time I believe it was
25 three units of adjusters under him that did

## Page 30

1  various tasks, and supervisors were in charge of
2  each one of those units.
3  So Mr. Markham would have designated
4  which unit was going to handle these particular
5  program of claims, and he would have overseen and
6  possibly established himself the protocols for
7  getting those claims into our computer systems
8  and overseeing that being accomplished so that
9  they could be assigned to adjusters to handle.
10 Q. Do you know if the Farnworth, V. Adamson
11 claim was assigned to a particular adjuster for
12 handling?
13 A. It was ultimately assigned to me when I
14 became employed by NARS. If and who it was
15 assigned to prior to that, I don't recall. I
16 don't believe anybody ever did any work on the
17 file prior to my handling it.
18 Q. When you received the file -- now,
19 there are two yellow sticky notes on here that I
20 placed in here, just for the record, and I'll be
21 removing those when I'm done, just so I don't
22 confuse you when you see those.
23 I'm showing you a document. Is this
24 the document that would be the file in question?
25 MR. PARKER: I'll object. I think --

## Page 31

1  you're talking about the Farnworth file?
2  MR. ANGSTMAN: Yes.
3  MR. PARKER: Okay.
4  THE WITNESS: No, that's not the
5  Farnworth file.
6  Q. (BY MR. ANGSTMAN) Okay. Where is the
7  Farnworth file?
8  A. It's my belief and understanding that
9  it is -- it was returned to Frontier Insurance
10 Company.
11 Q. Is it Frontier's policy -- or pardon
12 me. Is it Clarendon's policy through NARS to
13 keep a copy of those sort of things?
14 A. I really can't say what its policy was
15 because Clarendon never undertook a venture like
16 this, to my understanding, in the past. So I
17 don't know that they ever had a policy one way or
18 the other.
19 Q. You were the one looking at the file on
20 behalf of Clarendon through NARS. Do you recall
21 keeping copies before you returned them?
22 A. No, we did not keep copies.
23 Q. And who made the decision to return the
24 file to Frontier?
25 A. I made the recommendation to return

## Page 32

1  that file as well as approximately half a dozen
2  other files. I don't recall whether my immediate
3  supervisor made the final decision or whether
4  Mr. Markham, who would have been my supervisor's
5  supervisor, made the decision. But it was my
6  recommendation it was -- that they be returned.
7  Q. And how did you make that
8  recommendation?
9  A. I put together a memorandum. When I
10 started with North American Risk Services, I was
11 given a large group of these real estate claims
12 to handle with instructions to verify that all of
13 these were claims that were actually made
14 prior -- or I'm sorry, prior to or after the cut
15 off thru endorsement.
16 their endorsement based on the requirements of the
17 In going through the files that were
18 assigned to me, there were approximately, like I
19 said, about a half dozen that I thought were not
20 appropriate to be handled by Clarendon according
21 to the terms of the cut thru. So I put together
22 a memorandum and eventually all of those files
23 were returned to Frontier.
24 Q. Did you bring a copy of that memorandum
25 today?

Page 33

1 A. Yes, I believe I did.
2 Q. If you could identify that memorandum
3 for me.
4 A. That's it.
5 MR. PARKER: Just for clarification, is
6 that your original or is that a copy you made?
7 THE WITNESS: That's a copy. I don't
8 even have the original any longer. I have a copy
9 that I save on my hard drive on my computer.
10 MR. ANGSTMAN: Let's go ahead and mark
11 this.
12 MR. PARKER: My question is, should we
13 have this copied so we have additional copies or
14 do you need --
15 THE WITNESS: I can always print
16 another copy off of my computer.
17 MR. PARKER: Okay. Then use that one.
18 (Exhibit 6 marked.)
19 Q. (BY MR. ANGSTMAN) I'm showing you what
20 has been marked as Exhibit No. 6.
21 This is the memorandum you were just
22 testifying about?
23 A. Correct.
24 Q. Okay. And can you tell me where on
25 that memorandum does it reflect the decision on

Page 34

1 the Farnworth file?
2 A. Well, again, I didn't make the
3 decision. I simply made a recommendation. But
4 the second page deals with the Farnworth file.
5 Q. And who was your immediate supervisor?
6 A. His name is Bert -- with an "e" --
7 Harvey.
8 Q. Bert Harvey?
9 A. Um-hmm.
10 Q. Is Mr. Harvey still employed at NARS?
11 A. Yes.
12 Q. All right. Is he still your
13 supervisor?
14 A. Yes.
15 Q. Okay. And is he still in the same job
16 position that he was in at the time that these
17 files were received at Clarendon?
18 A. Yes.
19 Q. Okay. All right. Can I take a look at
20 that, please.
21 A. Sure.
22 Q. Thanks.
23 Okay. Your memorandum references a ROR
24 letter, which I think that stands for reservation
25 of rights. Is that correct?

Page 35

1 A. That's correct.
2 Q. Okay. Do you have a copy of that ROR
3 letter?
4 A. No. That would be the -- if it's the
5 ROR letter that I believe you're referring to,
6 it's the one that Frontier issued in the
7 Farnworth case, and that would be in the Frontier
8 claims file.
9 Q. And when was the last time you seen
10 that ROR letter?
11 A. I think I reviewed it after a copy of
12 the file was produced by Frontier pursuant to
13 discovery in this case. Prior to that, it would
14 have been, you know, roughly around the time this
15 memo was prepared back in 2002.
16 Q. And what investigation did you make
17 prior to writing this memorandum into the acts
18 and -- alleged in the Doug Stewart and Kelle
19 Watkins matter?
20 A. Just so I'm clear, you're asking me
21 what I investigated in the Stewart and Watkins
22 matter?
23 Q. Yes.
24 A. I reviewed and received the Stewart and
25 Watkins claims file which we had in our office at

Page 36

1 that time.
2 Q. All right. And in your review of that
3 file, which acts did you find to be related to
4 the acts in the Farnworth file?
5 A. I didn't review the file for purposes
6 of determining which acts were related. I
7 reviewed the file for purposes of determining
8 when the Stewart and Watkins case was originally
9 presented, when the claim was originally made by
10 them, because that was the issue that Frontier
11 was raising.
12 My purpose was to determine when the
13 claim was made in the Farnworth case. And since
14 Frontier said that the claim in Farnworth was
15 made at the same time as the claim in Stewart and
16 Watkins, I was reviewing the Stewart and Watkins
17 file to determine when that claim was made.
18 Q. Are you aware -- or if I say "you," I'm
19 talking about Clarendon. Is Clarendon aware of
20 any facts that would establish that Farnworth
21 made a claim prior to the cut thru endorsement?
22 A. Farnworth?
23 Q. Yes.
24 A. Not at this time. We have not reviewed
25 that -- I have not reviewed. I did not review

Page 37

1   that at the time, I should say. I apologize for
2   being incoherent there.
3      Again, my purpose was to review with
4   regards to whether this claim should be handled
5   by Frontier or by Clarendon pursuant to the cut
6   thru endorsement, not as to any other issues
7   related to the claim.
8     Q. Now, isn't it true, though, that
9   insurance companies often send out a reservation
10  of rights before they know for sure all the facts
11  that are involved and whatever the basis of that
12  right -- reservation is?
13    A. It's true that sometimes insurance
14  companies send out reservation of rights. I
15  don't know about often. Every insurance has
16  different policies and procedures that they have
17  to follow.
18    Q. But the fact that they claimed in a
19  reservation of rights letter that they're the
20  same claim isn't conclusive, is it?
21    A. Well, again, no. No, it's not. My
22  purpose, though, was not to determine whether or
23  not the reservation of rights letter was
24  accurate. My purpose was to determine whether or
25  not the claims should be handled under Frontier's

Page 38

1   auspices or whether pursuant to the cut thru
2   endorsement it should be handled by Clarendon.
3      As the memo states, my position was
4   that Frontier believed that the claim -- the date
5   of claim for Farnworth was the same as Stewart
6   and Watkins. Pursuant to the terms of the cut
7   thru endorsement, that would mean Frontier had to
8   handle that claim.
9      I wasn't really investigating it to
10  determine the truth of any of the allegations
11  made. It was simply to look at what date the
12  claim was made. And my determination was that --
13  Frontier's own position was it was pre-cut thru.
14    Q. Is Clarendon aware of any acts, any
15  specific acts, that are the same or related to
16  the acts as alleged in the earlier lawsuit by Doug
17  and Kellie Stewart against Real/Pro Inc. and
18  others? Any specific acts?
19    A. I'm sorry. Could you repeat the
20  question?
21    MR. ANGSTMAN: Maybe you could read it
22  back, see if it's a good question.
23    (Record read.)
24    THE WITNESS: I don't know that the
25  determination has been made as to whether or not

Page 39

1   the acts are related or not. Remember, we did
2   not investigate this case until -- we did not
3   have a case to investigate until just recently.
4   So I don't know that the determination has been
5   made at this point.
6    Q. (BY MR. ANGSTMAN) But at one point in
7   time, this file was sent to you by the claims
8   administrator for Frontier with an allegation
9   that it was covered by the cut thru endorsement
10  isn't that true?
11    A. It was sent to us with an allegation
12  that the claim was made after the effective date
13  of the cut thru endorsement.
14    Q. Correct. And at that point in time, no
15  investigation was done to determine whether or
16  not the actual facts of this case, that
17  Farnworth case, were the same or related to the
18  acts alleged in the Doug and Kellie
19  Stewart/Watkins case. Correct?
20    A. Any investigation at that point would
21  have been done by Frontier, not by Clarendon.
22    Q. And Frontier was the one, though,
23  sending you the file with the allegation that it
24  was supposed to be yours to handle?
25    A. Correct.

Page 40

1    Q. So isn't it safe to say that Frontier
2   contended that it was after the endorsement?
3    A. Well, they contended by sending the
4   file to us that the claim was made after the
5   endorsement. But as I pointed out in the memo,
6   the letter they sent to their own insured
7   contended that it was before the endorsement
8   effective date.
9      And so on the basis of their own letter
10  that they sent to their own insured taking the
11  position that it was before the cut thru
12  endorsement date, I sent the claim back -- or I
13  recommended the claim be sent back to Frontier
14  for their handling -- Hey, your words are this is
15  pre-cut thru. You guys should handle this.
16    Q. And you recommended it and Clarendon
17  followed your recommendation?
18    A. Yes.
19    MR. PARKER: North American Risk
20  Services on behalf of Clarendon followed his
21  recommendation.
22    MR. ANGSTMAN: Well, understood. Their
23  agent. Correct?
24    MR. PARKER: That's right.
25    MR. ANGSTMAN: And the deponent.

Page 41

1   Q. (BY MR. ANGSTMAN) Clarendon didn't
2   review the Real Estate Commission proceedings
3   against Mr. Adamson at that time, did they?
4   A. No.
5   Q. And Clarendon didn't review the Doug
6   Stewart and Kelle Watkins complaint at that time?
7   A. Yes, we did.
8   Q. You did review that?
9   A. Remember, the Stewart and Watkins case
10  was the one that Frontier was claiming was the
11  determination for when the first claim was made.
12  Frontier said Farnworth is the same as the
13  Stewart and Watkins case. Stewart and Watkins
14  was pre-cut thru; therefore, Farnworth was
15  pre-cut thru.
16  Q. Actually, did you know that that's not
17  true? Stewart and Watkins isn't pre-cut thru.
18  A. Actually, it is.
19  Q. And how do you know that?
20  A. There's a letter here from -- in the
21  Stewart and Watkins case dated September of 1999
22  to their real estate agent saying, We've been
23  damaged. You need to fix this.
24  Q. Can you show me that?
25  A. Sure.

Page 42

1   The letter also references -- although
2   I don't have a copy, the letter references an
3   earlier letter that they claim to have sent.
4   In the letter dated September 7th,
5   1999, from Doug Stewart and Kelle -- that's
6   K-e-l-l-e -- Watkins to Linda Adamson, Real/Pro
7   Foundation, Jon Adamson, President, Real/Pro
8   Foundation, Jerry Adamson, Assistant Vice
9   President, and it is approximately a three-page
10  letter that outlines in detail the duties that
11  they believe that Real/Pro and the others owed
12  them and did not uphold. It outlines the
13  expenses and damages they claim to have occurred,
14  and it ends by saying, "Please let us know." It
15  provides them a couple solutions for how to fix
16  these problems and demands that they tell them
17  which one of these solutions they --
18  Q. Can I take a look?
19  A. Certainly.
20  And as I said also, it references a
21  letter that was allegedly sent to Real/Pro and
22  the Adamsons approximately one week before that
23  also.
24  Q. And is it your position that this
25  letter dated September 7, 1999, is a claim

Page 43

1   with -- as that term is defined in the Frontier
2   policy?
3   A. It's a written demand for money or
4   services, yes, which is a claim.
5   Q. And is that how you define a claim?
6   A. That's how I believe the policy at
7   issue defines a claim.
8   Q. A written demand for money --
9   A. -- or services.
10  Q. Or services. Okay.
11  A. Right.
12  Q. And maybe we can -- well, the next
13  exhibit will be the policy. I'm going to put --
14  you've already got a blue tab on these pages, but
15  I'm going to put a pink tab on each of these
16  three pages and put No. 7. Then the court
17  reporter can copy these as No. 7.
18  (Exhibit 7 marked.)
19  MR. PARKER: Let's go off the record
20  for just a second.
21  MR. ANGSTMAN: Sure.
22  (Discussion off the record.)
23  Q. (BY MR. ANGSTMAN) Do you know when
24  this letter was given to the Adamsons,
25  Exhibit 7 -- I'm talking about Exhibit 7.

Page 44

1   A. Yeah. You're talking about the
2   September 7, 1999, letter?
3   Q. Yeah.
4   A. I'd have to go back to the file -- if
5   you want me to, I can -- to determine when it was
6   given to the Adamsons or when Frontier believed
7   it was given to the Adamsons.
8   Q. Well, if there's any evidence of when
9   that -- I mean, this is an unsigned letter, is it
10  not?
11  A. That is correct.
12  Q. I mean -- and I don't know, so I could
13  only speculate if it was ever actually even given
14  to them or if this was produced in discovery. I
15  see a Bates number at the bottom. And the fact
16  that it was produced in discovery could mean that
17  it was a letter that was written and never
18  delivered, and I would just like to know, you
19  know, when this actually came in the possession
20  of Mr. Adamson and then when -- and how it would
21  of the notice of Frontier because that would
22  provide the basis of when the claim was made.
23  If the Watkins wrote a letter and never
24  actually mailed it, then that wouldn't be a
25  claim, I wouldn't imagine that.

Page 61

```
 1  with regard to -- strike that. It's a horrible
 2  question.
 3        MR. PARKER: I was getting ready to
 4  object.
 5        MR. ANGSTMAN: Next page. Okay.
 6  Q. (BY MR. ANGSTMAN) To claims that were
 7  covered on the cut thru endorsement, what is
 8  Clarendon's position as to how those claims were
 9  to be handled?
10        In other words, if a claim came in that
11  was clearly after the cut thru was in effect, how
12  did Clarendon handle those?
13  A. The adjuster was assigned, the adjuster
14  would review the complaint, and the policy would
15  provide the insured with a defense under the
16  policy if the policy provided coverage for the
17  allegations in the complaint. He would handle it
18  according to the best practices and standards of
19  the industry.
20        That's a very vague question, you know,
21  how you would handle a claim.
22  Q. Well, I guess when I was -- and part of
23  what I was trying to -- and I appreciate that. I
24  wasn't trying to be vague, but I was trying to
25  understand if Clarendon would actually defend or
```

Page 62

```
 1  if they just would indemnify after a judgment was
 2  entered?
 3  A. Oh, no. They would provide a defense.
 4  I believe the policy obligates them to defend and
 5  indemnify the insured.
 6  Q. And that's an exhibit to the complaint
 7  that we have in front of us?
 8  A. MR. PARKER: That is not the
 9  accurate --
10        (BY MR. ANGSTMAN) The policy is not
11  the right one, but the cut thru is.
12        Is it your testimony that the cut thru
13  endorsement basically just required Clarendon to
14  step into the shoes of Frontier and take over as
15  if they were Frontier?
16  A. Correct.
17  Q. All right. And that's the way they
18  handled those files that did -- that were
19  determined to have arisen after the cut thru went
20  into effect?
21  A. Correct, although we did, you know,
22  review for coverage, and in some limited
23  instances we would raise issues that Frontier had
24  not raised. We felt we had the option of
25  essentially going back to the beginning and
```

Page 63

```
 1  deciding whether or not a duty was owed under the
 2  policy, even if Frontier had not done that. I
 3  don't think that happened in very many cases, but
 4  we didn't look at this as just a -- to plug
 5  ourselves in right at this point in the stream.
 6  You know, we felt like we had the whole range of
 7  options available to us.
 8  Q. So in other words, you could send a
 9  reservation of rights letter even though Frontier
10  hadn't?
11  A. Correct.
12  Q. Has there been any litigation over your
13  handling of that -- handling of those claims that
14  way?
15  A. I'm not aware of any. There hasn't
16  been on any of the files that I worked on with
17  regards to this program.
18  Q. Right.
19        MR. PARKER: Litigation with?
20        MR. ANGSTMAN: With regard to issuing a
21  new reservation of rights after --
22        MR. PARKER: Okay. With the insured
23  versus, like, Frontier or somebody. Okay. I
24  just wanted --
25        MR. ANGSTMAN: No, no. I don't mean
```

Page 64

```
 1  between Clarendon and Frontier or something of
 2  those sorts, although I am curious about that.
 3  But we'll cover that later.
 4  Q. (BY MR. ANGSTMAN) With regard to the
 5  policy and its endorsement, the cut thru
 6  endorsement, is it Clarendon's position that each
 7  licensed insured has a policy limit of its own?
 8        In other words, do they stack or do
 9  they overlap? Is there 100,000 coverage or
10  200,000 as far as in Clarendon's coverage with
11  regard to any of the claims covered in -- by the
12  policy -- the correct policy, which is an exhibit
13  to this deposition?
14        MR. PARKER: Okay. Just so I
15  understand the question --
16        MR. ANGSTMAN: Um-hmm.
17        MR. PARKER: -- when you say "stack" or
18  "overlap," are you talking about the separate
19  policies for Adamsen and RealPro Inc.?
20        MR. ANGSTMAN: Correct.
21        MR. PARKER: Okay.
22        THE WITNESS: Well, it would be
23  Clarendon's position that if there were separate
24  policies for insureds involved in the same loss,
25  then each policy would respond to the allegations
```

## Page 133

```
 1   Other than that, this is not
 2   of documents in the possession of Clarendon other
 3   than, of course, ones that were obtained through
 4   discovery of third parties that relate to this
 5   case.  Is that correct?
 6        A.  That's my understanding.
 7        MR. PARKER:  And when we said that
 8   there may be billing guidelines that weren't
 9   today, and there's also, I believe, the letter
10   that --
11        THE WITNESS:  On the Duesman case.
12        MR. PARKER:  -- that Mr. Keith sent to
13   Nick Estabrook on Duesman, you know.
14        MR. ANGSTMAN:  Okay.  And can you -- I
15   don't think those are going to require, you know,
16   continuing this deposition -- the deposition on
17   those, but I would like to see them just in case
18   and make sure there's nothing in there that I
19   wanted to ask about.
20        MR. PARKER:  Yeah.  I've got a copy of
21   the Duesman letter if you want to look at it
22   right now.
23        MR. ANGSTMAN:  Why don't we do that
24   real quick.  Before you go, though -- well, go
25   ahead.
```

## Page 134

```
 1   Let's go off the record.
 2        (Recess.)
 3        (Exhibit 17 marked.)
 4        MR. ANGSTMAN:  Let's go back on the
 5   record.
 6        Q.  (BY MR. ANGSTMAN)  Showing you what's
 7   been marked as Exhibit 17, do you recognize this?
 8        A.  Yes.
 9        Q.  What is it?
10        A.  This is a letter that I sent to Nick
11   Estabrook with Frontier Insurance Company in
12   reference to a new claim that one of Frontier's
13   insureds had referred to them and they had turned
14   to us.
15        Q.  Okay.
16        A.  It relates to claims that are
17   substantially similar and related to the
18   Farnworth and Stewart and Watkins matter and a
19   couple of the others.
20        Q.  And the handwriting on that, do you
21   recognize that?
22        A.  No.
23        Q.  Was that handwriting -- oh, wait.  I
24   think -- do you have a copy of this particular
25   letter in your files?
```

## Page 135

```
 1        A.  I do not know.  Since this is not
 2   directly in reference to the Farnworth case, I
 3   did not look for this.
 4        This may be on my computer still.  I
 5   don't think this is in a claims file because this
 6   would have been in reference to the Duesman
 7   matter.
 8        You see where it says "Our Claim
 9   Number:  Not yet assigned"?
10        Q.  Um-hum.
11        A.  Chances are when it came in, it came in
12   to me since I did most of the Idaho stuff.  It
13   came to me before it got set up, and I looked
14   into it and determined that it was a situation
15   related to the Farnworth case and then just
16   forwarded it right on back to Frontier before we
17   even set up a claims file.
18        Q.  I mean, it does reference the Farnworth
19   cases in there --
20        A.  Right.
21        Q.  -- and I don't doubt your veracity in
22   anyway.  I'm not trying to accuse you or
23   anything, but I'm just wondering if there's any
24   way you might be able to check your computer one
25   last time for this particular document and any
```

## Page 136

```
 1   other ones like it that have the name Farnworth
 2   in it or something because --
 3        A.  Well, there's no way to check for every
 4   document in my computer that might have the name
 5   Farnworth in it just on that nature.  I can look
 6   at every letter I've got and -- you know, I
 7   didn't look honestly at this letter.  I didn't
 8   see this letter when I was looking through it.
 9   But I'll double-check and see if it's there.
10        Q.  I mean, there are utilities that can
11   search an entire hard drive for a word --
12        A.  Right.
13        Q.  -- and I don't mean to belabor the
14   point, but my job is to make sure that I have the
15   whole universe of documents.
16        I know you didn't -- your counsel had a
17   copy of this, and I recognize now that this came
18   out of a deposition we did in New York.  The
19   reason -- your counsel told me that, for one; and
20   two, I now remember those file numbers from New
21   York.  Those are Frontier file numbers, I think,
22   or -- let's see, Frontier -- never mind.  It
23   doesn't matter.  But I'm almost positive those
24   were the file numbers we were working with in New
25   York when they assigned the -- they assigned new
```

1 file numbers to them once you sent them --
2 shipped them back up, and those are the file
3 numbers.
4 A. Right.
5 Q. And so I just want to make sure I have
6 the entire universe of documents. And if there
7 is correspondence between you and Mr. Estabrook,
8 I -- did you receive a reply to this?
9 A. No, I don't recall ever receiving any
10 other information about the Duesman case.
11 Q. Okay. And Mr. Estabrook never
12 contacted you by telephone or any other manner in
13 response to this letter that you're aware of?
14 A. I don't recall any further conversation
15 with Mr. Estabrook in relation to the Duesman
16 case. I know I sent this letter references a
17 conversation that we had. You know, this was all
18 still right about within 60 days or so of when I
19 started with the company and when we were really
20 just kind of digging our way through all of the
21 real estate stuff.
22 I may have picked up the phone and
23 called him to discuss this case and then sent
24 this letter to him in -- as furtherance of our
25 conversation, but I don't recall any phone

1 conversations afterwards about that.
2 Q. Okay.
3 A. In fact, almost all of the
4 conversations I ever had with Mr. Estabrook or
5 anybody up at Frontier were initiated by me or by
6 us. They didn't call us too often.
7 Q. Okay. And this particular letter
8 essentially sets forth in the same basis that you
9 explained to me as to why the Duesman case was
10 not subject to the cut thru endorsement.
11 Correct?
12 A. Correct.
13 Q. Is there any other bases that you are
14 aware of now besides those set forth in this
15 letter and what you testified to earlier that
16 would support a theory that the Farnworth case
17 was not subject to the cut thru endorsement?
18 A. No, I'm not aware of any other
19 information at this time other than what we've
20 discussed here today.
21 Q. All right. And that's been marked as
22 an exhibit.
23 MR. ANGSTMAN: And with that, I have no
24 further questions, Counsel.
25 If you want to inquire at all, Counsel.

1 MR. PARKER: No.
2 MR. ANGSTMAN: Okay. I do want to say
3 for the record, we're not closing this deposition
4 because there are a few categories on our list
5 that might still be open, and I'm not sure that
6 we want to explore those further; I'm not sure
7 that it makes a lot of sense to spend more time
8 on them depending on the issues. But I want to
9 at least leave the option open that the -- if I
10 could look at the Notice, Exhibit 1.
11 (Discussion off the record.)
12 MR. ANGSTMAN: We went through Exhibit
13 B at the beginning of the deposition, and there
14 was a few of the categories, in particular No. D,
15 Exhibit B & D, which is the information in the
16 custody and control of Clarendon that pertains to
17 the rehabilitation of Frontier and that there may
18 be some information that other parties within
19 Clarendon have to respond to that you weren't
20 prepared for knowledgeable on those.
21 Then there was a couple of other areas
22 where you said that there was just -- that maybe
23 that was -- you weren't the best person on it,
24 and I think that was with regard to issuance of
25 the cut thru endorsement which occurred prior to

1 your employment there and --
2 THE WITNESS: Correct.
3 MR. ANGSTMAN: -- those negotiations
4 and whether -- and in how much detail we're going
5 to explore those I think is something that
6 Counsel and I can discuss after today and after
7 we review the transcript and the cases and
8 decide, but -- is that okay with you, Counsel?
9 MR. PARKER: Yeah, with one caveat is
10 that when we first decided to set up this
11 deposition and out, I understood that
12 Mr. Harvey would be the representative that would
13 come out and speak and he was amendable to come
14 to Idaho. You know, if there was some other
15 individual pursuant to the 30(b)(6) that you may
16 want to talk to and be designated, I don't know
17 how amendable they would be to come to Idaho. So
18 that's -- that would be an issue.
19 MR. ANGSTMAN: You certainly can
20 reserve your rights on that issue, and I will as
21 well. And we'll --
22 MR. PARKER: Okay.
23 MR. ANGSTMAN: -- have to, I guess,
24 have that -- if it comes to that, we'll have to
25 have that, you know, determined. At this point I

```
EXHIBIT
OO
```
North American Risk Services, Inc.
P.O. Box 945055
Maitland, FL 32794-5055
Tel. (407) 875-1700
Fax. (407) 875-8781
A Member of the Hannover Re Group

June 21, 2002



PIONEER G/L

Mr. Nick Estabrook
Frontier Insurance Company
195 Lake Louise Marie Road
Rock Hill, NY 12775-8000

RE:      Claimant:       Kevin Duesman
         Insured:        Jon Adamson, Jerel Adamson, Real/Pro, Inc Realty Center
         Our Claim No.:  Not yet assigned

Dear Mr. Estabrook:

Please allow this to confirm and further our conversation of last week in reference to the above noted matter.

As we discussed, we received recently new complaints filed against insured through the Idaho Real Estate Commission Program.  The new suits, filed against Jon Adamson and Jerry Adamson, involve allegations similar to those raised in other, previously handled lawsuits involving the same insureds, specifically your files  5085C, 5085D and 5085AA.

Those files were returned to Frontier Insurance Company for handling because the date of loss for those files was determined to be prior to the cut of the thru date for this policy.  The date of loss was in turn determined by referring to a letter within the Farnsworth file (5085C) which said "Frontier has determined that this lawsuit arises out of acts which are the same or related to the acts alleged in an earlier lawsuit filed by Doug Stewart and Kellie Watkins against Real/Pro, Inc. and others".

To make this more succinct, this new complaint (Duesman) should have the same date of loss as Farnsworth because it involves substantially the same allegations as those claimed in the Farnsworth case, and Frontier has previously determined that the Farnsworth claim has the same date of loss as the Stewart/Watkins claim.   The date of loss for the Stewart/Watkins claim is well before the cut thru date of loss for this policy.

Mr. Nick Estabrook.
June 21, 2002
Page 2

Finally, as we discussed, we searched the previous claims to see if these same insured had been sued and/or made a claim under their policies relative to either the Farnsworth or the Stewart/Watkins claim.  Jon Adamson was sued in the Farnsworth case and Frontier established claim number 5085C for his defense.  Jerel (Jerry) Adamson also made a claim with Frontier and was assigned claim number 5085AA.

Based on our review of the policy and the facts, it appears that the claims for Jon Adamson and Jerel Adamson arising out of the Duesman lawsuit should be handled by Frontier Insurance Company as the dates of loss are prior to the effective date of the cut thru endorsement.

This letter is being forwarded to you via facsimile and regular mail but the lawsuits in question are only being sent by regular mail.  Should you have any questions, please feel free to call me directly at (800) 315-6090 extension 1381.

Very truly yours,

Harry Keith
Claims Examiner

cc:    John Dee Adamson
       Jerel Adamson

7520010430001 Gillman

EXHIBIT
PP

COPY

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO
- - - - - - - - - - - - - - - - - - x
WARREN F. FARNSWORTH,

Plaintiff,

CASE #: 05-021-S-BLW

- versus -

CLARENDON NATIONAL INSURANCE
COMPANY,

Defendant.
- - - - - - - - - - - - - - - - - - x

April 15th, 2005
195 Lake Louise Marie Road
Rock Hill, New York
10:25 a.m.

EXAMINATION of the Non-Party Witness,

MICHAEL R. DONOVAN, before Constance M. Walker,

a Shorthand Reporter and Notary Public in and

for the State of New York.

* * * * *

COVENANT REPORTING
Certified Shorthand Reporting
26 Fleetwood Drive
Newburgh, New York 12550
(845) 564-7477

COVENANT REPORTING

```
 1                    MICHAEL R. DONOVAN
 2              (WHEREUPON, there was a brief off
 3        the record discussion held.)
 4              MR. PARKER:  Back on the record.
 5        Counsel has provided a clarification
 6        that actually that the employer was Frontier
 7        Insurance but the Frontier Insurance Group
 8        provided services through a number of it's
 9        subsidiaries; is that accurate?
10              MR. DuBOIS:  Correct.
11        Q    And can you give me sort of a thumbnail of how
12        you progressed in the company; did your
13        responsibilities change, did you get promotions?
14        A    Yes.  Actually, when I started here I was hired
15        as a litigation supervisor and then I guess sometime
16        between '96 and '98 I became a Claims Manager and I
17        stayed there through the rehabilitation.
18        Q    And as a Claims Manager, what are your
19        responsibilities?
20        A    Essentially, oversee the General Liability
21        Claims Department both from an administrative and
22        technical standpoint reporting directly to the Chief
23        Claims Officer who is responsible for all of the
24        various claims departments.
25        Q    And the 1999 to 2001 periods, who was your
```

COVENANT REPORTING

```
 1                    MICHAEL R. DONOVAN
 2    supervisor, who did you report to?
 3        A.    That changed.  What is the actual start date.
 4            MR. PARKER:  Well we are referencing
 5    -- let me put this on the table.  We will mark this a
 6    Exhibit F.
 7            ( Joint Exhibit F for
 8    identification, Policy, was marked by the
 9    reporter. )
10        Q    Showing you what has been marked as Exhibit F,
11    and this is basically the policy that is of some
12    interest to us today and do you recognize that?
13        A.    Yes.
14        Q    And the last page that is an endorsement and
15    that we will discuss in the course of our visit today.
16    And you are familiar with the property/casualty
17    reinsurance endorsement with the effective date of May
18    10, 2000?
19        A.    Yes.
20        Q    And the policy itself has a policy, commercial
21    policy number 98-BO-0003-ID with a policy period of
22    October 1, 1998 to October 1, 2000.  And that's a
23    claims's made policy?
24        A.    Yes.
25        Q    And what is your understanding of a claims made
```

COVENANT REPORTING

```
 1                      MICHAEL R. DONOVAN
 2    policy?
 3        A    Claims made policy requires that or that I
 4    should say trigger for coverage that the date the claim
 5    is first made with the insured.
 6              MR. DuBOIS:   With the carrier.
 7        A    First made against the insured and this policy
 8    is also as claims made for the policy would have to be
 9    made to the insured and reported to the carrier both
10    within the policy period.
11        Q    Does it spell out in the policy itself the
12    requirement that not only the claim being made but also
13    be reported to -- are you familiar enough with the
14    policy that shows the language --
15        A    Actually, it is right in the bold language at
16    the top, not bold but in capital letters underneath
17    where it says:  This is a claims made policy, please
18    read this policy carefully, in the paragraph underneath
19    that and I believe it is reiterated within the body of
20    the policy also.
21        Q    So you were telling me who your supervisors were
22    and I was referencing back to this policy so that we
23    would have a timeframe.  So during the term of the
24    policy, the policy period, do you recall who your
25    supervisor might have been?
```

```
 1              MICHAEL R. DONOVAN

 2      A    From October 1, 1998 through October 1, 2000?

 3      Q    Yes.

 4      A    I believe it would be -- could be one of two;

 5   Joan Barkley or Jerry Steimers.

 6      Q    And either one of those -- there was one left

 7   and an the other one came on?

 8      A    Let's just say that the company's financial

 9   problems grew that there was a change of cast of

10   characters over the period of time there.

11      Q    Who do you currently report to?

12      A    A gentleman by the name of Kent Lombardi.

13      Q    What was the period of time of the supervisors

14                                --

15      A    I was starting with the beginning policy period

16   up to the end and then I was going to go after that.

17      Q    So currently we have got Kent Lombardi.  I

18   assume that Joan Barkley was before Jerry Steimer?

19      A    Actually, no my direct supervisor I believe --

20   Do you know when Joan left?

21           MR. DuBOIS:  I was just trying to --

22   I think she left -- well, well over 2000.  I

23   think she left after the rehabilitation.

24           MS. STANTON:  Right around that

25   time.
```

1           MICHAEL R. DONOVAN

2   itself regarding what the specific grounds are.  Do you

3   know how the Stewart/Watkins matters was finally

4   resolved?

5        A.   Yes.  I believe a settlement was entered into I

6   forget the amount but I think it was in the

7   neighborhood of $20,000.00.  I think the insureds

8   participated both by way of deductible and I think Jon

9   Adamson may have tossed in some of his own money.  I

10   think Frontier's payment was $19,500.00, if memory

11   serves me correct or Duesman, one of the two settled

12   for that amount.

13        Q.   And did Frontier pay for the settlement on that

14   claim, contribute to the settlement?

15        A.   Yes.

16        Q.   And I don't know if -- I don't see directly here

17   what -- there is a letter in here in the file in

18   Exhibit C-7B which references a settlement offer that

19   might help refresh your memory.  I don't know if that

20   -- Well, --

21        A.   Are you trying to get to what the final

22   settlement was?

23        Q.   I am just curious about how much Frontier paid.

24   I might have something better for you.  So -- there

25   might be a better reference.

```
1           MICHAEL R. DONOVAN

2           MR. DuBOIS:  Do you need

3      clarification of something?

4           THE WITNESS:  The notes --

5           MR. PARKER:  Off the record.

6      ( WHEREUPON, there was a brief off

7      the record discussion held. )

8           MR. PARKER:  Back on the record.

9      Q    To refresh your recollection let's look at

10          Exhibit C-8A --

11     A    Okay, yeah, that's it.

12     Q    There is a -- it looks like a printout of a

13          computer page?

14     A    Right.

15     Q    That would be from Frontier's data base --

16     A    This is what would actually be Louisville's.

17     Q    Louisville's?

18     A    Yes.

19     Q    And it sets forth the settlement amount paid by

20          Frontier?

21     A    Right.

22     Q    And what was that?

23     A    The total settlement was $23,500.00 and the --

24     $23,500.00 and the -- Frontier's participation was

25     $19,500.00.
```

COVENANT REPORTING

```
 1                   MICHAEL R. DONOVAN

 2      Q     And Estabrook --

 3      A     Correct.

 4      Q     John Johnson?

 5      A     He is the State's equivalent of a CEO -- CFO,

 6      for the Frontier Rehabilitation.

 7      Q     Kent Lombardi?

 8      A     He would be my boss, Chief Claims Officer.

 9      Q     And you were in this e-mail group?

10      A     Yes.

11      Q     And Neil Conelly?

12            MR. DuBOIS:  He would be a

13      independent contractor hired as administrator by

14      the Superintendent of Insurance.

15      Q     And is that your understanding?

16      A     Yes.

17      Q     All right.  The initial transmission would be by

18      Mr. Estabrook as we identified on the 22nd of April in

19      the afternoon about 3:00 in the afternoon?

20      A     Yes.

21      Q     And there is correspondence of the same date, he

22      sent the letter to Mr. Keith?

23      A     Yes.

24      Q     What is WINS, W-I-N-S?

25      A     That's the computer system.
```

COVENANT REPORTING

96

1        MICHAEL R. DONOVAN

2    regard?

3        A.    No.

4        Q.    Mr. Johnson then jumps in on the 27th, I'm just

5    guessing that he might have had -- well, strike that.

6    He responds late on April 27th:  When were the payments

7    made by PIC seeking recovery from, question mark,

8    question mark.  And what is Mr. Johnson's interest?

9        A.    Again, as the essentially the Chief accountant

10   under the rehabilitation I guess he wants to know when

11   we made the payments.  The second question, seeking

12   recovery from I think he got confused by all the

13   subrogation discussion.

14       Q.    In the hierarchy of things were does Mr. Conelly

15   layout, where is he in this discussion?  Does he

16   spearhead the other people in conversations?

17       MR. DuBOIS:  I would say, yes.

18       Q.    You would agree --

19       A.    Even though he is technically a consultant he is

20   on a technical basis he is pretty much the last word

21   under the rehabilitation.

22       Q.    So, Mr. Estabrook then comes in on the 28th of

23   April and says:  WINS, shows the payments were made on

24   the dates and amounts, the checks numbers and to the

25   entities indicated in the attached.  And apparently

COVENANT REPORTING

```
 1                MICHAEL R. DONOVAN

 2   letter to the e-mail.

 3        Q    Letter, April 22nd, to Mr. Keith?

 4        A    Right.

 5        Q    So, the last word on there is from Mr.

 6   Estabrook, isn't it?

 7        A    Yes.

 8        Q    And by the way do you see the cc to Fran Bliss?

 9   Who is Mr. Bliss?

10        A    Actually, it's Mrs. Bliss.  Fran is the --

11             MR. DuBOIS:  Co-estate manager.

12        A    Co-estate Manager for Frontier Insurance Company

13   (In Rehabilitation).  She is essentially at least from

14   an Administrator's standpoint the last word on what

15   happens here.

16        Q    But, she -- what is her relatio[bsj]l[p to Neil

17   Conelly?

18        A    That's an interesting question.  Neil is more on

19   the technical claims side and Fran is more on the

20   administrative side but it is somewhat a two-headed

21   monster, if you will.

22        Q    And all right.  So, he says:  Bill, and he is

23   referring to Bill Schmidt, you are right, the

24   expectation I expressed was that Frontier Insurance

25   Company should be reimbursed for the payment it has
```

COVENANT REPORTING

1        MICHAEL R. DONOVAN

2        Q    Looking at the memo, the e-mail threat, looking

3   at the last entry, which turns out to be

4   chronologically the last, but in order to top one, on

5   the first page of a two-page document.  Looking at the

6   third paragraph and in reference to the steps before --

7   Neil shares his wish that neither this file nor any

8   other file be handled by Clarendon, going to the next

9   paragraph.  On being informed of that wish, I bend my

10  assumption and upon rumor, I forward a new speculation,

11  suspicion, and conjecture that one:  Clarendon was

12  working off the trust fund or an escrow account and

13  that two; at the end of the day, Frontier Insurance

14  Company will share in any unspent amount and that

15  three; Neil probably believes that Frontier Insurance

16  Company can do a better job handling claims that

17  Clarendon thereby increasing the size of the unspent

18  amount to be returned to Frontier Insurance Companyy.

19  Is that the position of Frontier Insurance Company?

20       MR. DuBOIS:  Michael is not able to

21  answer that.

22       Q    However, I am not now and never have been privy

23  to Clarendon's arrangements.  I have no knowledge or

24  information on that matter beyond Neil' wish,

25  referencing Neil Conelly's statement that

110

MICHAEL R. DONOVAN

1    notwithstanding prior protocol I don't want this or any

2    other file handled by Clarendon.  Is that how you

3    understand that?

4         A    That that was his wish, yes.

5         Q    Do you recall any subsequent discussions

6    regarding the cut-through endorsements and possible

7    claims against Clarendon Insurance Company for the

8    litigation costs incurred by Frontier in the handling

9    of claims against the Adamson defendants?

10        A    No, I don't.

11        Q    At anytime during the adjustment of the

12   Farnworth clam did Frontier notify Clarendon or it's

13   third party administrator that Frontier was in arrears

14   in paying defense counsel?

15        A    Not to my knowledge.

16        Q    At anytime during the adjustment of the

17   Farnworth claim did Frontier notify Clarendon or it's

18   third party administrator that the defense counsel had

19   field motions to withdraw on the grounds of

20   non-payment?

21        A    Not to my knowledge.

22        Q    At anytime during the adjustment of the

23   Farnworth claim did Frontier notify Clarendon or it's

24   third party administrator that counsel for Farnworth

25

COVENANT REPORTING

1        MICHAEL R. DONOVAN
2   had offered to the insureds that it would settle all
3   claims against them if they would assign their rights
4   under the insurance policies to Mr. Farnworth?
5        A    No, but let me add though that the threats to
6   withdraw the offer of settlement by Plaintiff's counsel
7   and the resolution of the case all took place within a
8   space of about one week.
9        Q    At anytime during the adjustment of the
10  Farnworth claim did Frontier notify Clarendon or it's
11  third party administrator that Mr. Farnworth -- excuse
12  me, that Mr. Adamson, Jon Adamson, had made an
13  assignment of it's claims under the policy to Mr.
14  Farnworth?
15       A    Not to my knowledge.
16       Q    Were any claims that Frontier has made that
17  Clarendon paid defense counsel occurred in defense of
18  the Farnworth matter?
19       A    I don't know of any further communication
20  between Clarendon and Frontier that has occurred
21  subsequent to the letter that Estabrook sent that we
22  just discussed and in fact the first time I -- well,
23  that you reacquainted me with that letter.
24       Q    Do you know if -- are you aware of any claims by
25  Frontier that Clarendon paid any settlement costs

COVENANT REPORTING

```
 1               MICHAEL R. DONOVAN
 2    incurred in the defense of the Stewart/Watkins matter?
 3         A    I don't have any specific knowledge, but can't
 4    honestly say whether or not that that has occurred or
 5    not, but from what I observed, that has not occurred.
 6         Q    Same question with regards to any settlement
 7    costs incurred with regards to the Duesman matter.
 8         A    I believe the same answer would apply.
 9         Q    And in terms of attorneys' fees regarding
10    Stewart/Watkins, any claims made against Clarendon
11    paying those defense costs?
12         A    Not that I know of.
13         Q    And similarly with Duesman, paying defense
14    counsel?
15         A    Not that I know of.
16         Q    Are you aware of any such demand contemplated
17    with regards to the costs incurred by Frontier with
18    regards to any of these claims; Stewart/Watkins, the
19    Farnworth, Duesman, any contemplation that you are
20    aware of that a claim is going to be made for either
21    defense costs and/or settlement costs?
22         A    I have no specific knowledge of anything that is
23    in the works as we speak.
24         MR. PARKER:  That's it.
25         MR. ANGSTMAN:  Let's go off the
```

1     MICHAEL R. DONOVAN

2     record for a second.  I just want to outline

3     where I am going to go and then I am going to

4     take this from the standpoint of you're the Frontier

5     and I am just going to be asking you questions,

6     not whether you have personal knowledge, I am

7     just -- off the record.

8     ( WHEREUPON, there was a brief break

9     taken in the proceedings. )

10    MR. ANGSTMAN:  Back on the record.

11    During the break, Mr. Parker and I

12    reviewed a stipulation and two issues.  First of

13    all, that a reservation of rights letter

14    containing and I'm going to recite a paragraph

15    that says:  We hereby agree to accept this

16    tender of defense with full reservation of and

17    without prejudice to any and all rights which

18    Frontier may have under the policy.  In

19    addition, you have the right to appoint, at your

20    own expense, personal counsel to advise and

21    represent you regarding the matters that we

22    believe are not covered by the policy.  Further,

23    Frontier will defend you for all claims made

24    against you in this matter unless and until such

25    time that Frontier's duties under the policy are

COVENANT REPORTING

114

1    MICHAEL R. DONOVAN
2    concluded.  Frontier specifically reserves the
3    right to withdraw from the defense in this
4    matter, with due notice to you, in such an
5    event.  And, --
6    MR. DuBOIS:  The only caveat I would
7    make it that if there is such a reservation
8    right it does it will appear it will speak for
9    itself.
10   MR. ANGSTMAN:  That's fine.  I would
11   agree with that if there is another reservation
12   of rights contained with different language then
13   this stipulation would be superseded by the
14   actual terms of the letter.
15   MR. DuBOIS:  Right.
16   MR. ANGSTMAN:  Fair enough.
17   Further stipulation that if a
18   certificate of coverage, real estate licensee
19   errors and omissions insurance that was in
20   effect at the time that the claim was made for
21   Real/Pro, Inc. doing business as Realty Center
22   and one for Kevin Ford inasmuch as those two
23   files have been unable to be located at the time
24   of this deposition.
25   MR. DuBOIS:  Okay.  And, the only

1        MICHAEL R. DONOVAN

2    caveat that I have is that the letters that we

3    have seen already that Mr. Ford may have had

4    optional coverage at the time of Duesman.

5        MR. ANGSTMAN:  Mr. Ford may not have

6    coverage because he breached his duties he was

7    insured --

8        MR. DuBOIS:  Yes.

9        MR. ANGSTMAN:  -- but, that there

10   was one of these certificates of coverage both

11   of those and they simply are not able to be

12   located.

13       MR. PARKER:  Off the record.

14       MR. ANGSTMAN:  Yes.

15       (WHEREUPON, there was a brief off

16   the record diffusion held.)

17       MR. ANGSTMAN:  Back on the record.

18   Is there anything further that you

19   wanted to add to the stipulation?

20       MR. PARKER:  No, other than the

21   documents, if we get the documents, they speak

22   for themselves.

23       MR. ANGSTMAN:  We'll mark this.

24       (WHEREUPON, Joint Exhibit G for

25   identification, Annual Statement- 12/31/04, was

1     MICHAEL R. DONOVAN

2     office when they need to request a check and it is

3     dated August 15, 2001.

4          Q     And does that establish when the Watkins/Stewart

5     case was settled and the claim paid?

6          A     Yes.

7          Q     And when did that take place?

8          A     It appears to be on or about the same date,

9     August 15th, 201.

10         Q     In relation to when Frontier became insolvent or

11    was declared insolvent, was this before or after?

12         A     This would be immediately before we were

13    declared insolvent.

14         Q     Just a number of days?

15         A     Slightly less than two weeks.

16         Q     I'm going to hand you what has previously been

17    marked a Exhibit C-6 in the deposition and I'll show

18    you what's been clipped to inside of the front cover

19    and this document reads:  Defense Planning and Budget.

20    Do you see that?

21         A     Yes.

22         Q     And what is the Defense Planning and Budget?

23         A     It's a document that we came  up with here to --

24    so that can estimate of what our exposure would be from

25    and L & E standpoint; loss adjustment expenses, try to

EXHIBIT
00

**From:** James Estabrook
**To:** Bill Schmidt; Cheryl Smiley; John Johnson; Kent Lombardi; Mike Donovan; Neal Conolly
**Date:** 4/22/04 2:58PM
**Subject:** 74069, 74071 Farmworth & Duesman

Wins shows ~$98,000 in loss & defense payments on these two related files.

These claims were rejected by Clarendon as having dates of loss prior to the "cut thru". The correct dates of loss are after the 5/10/00 "cut thru", and they are therefore Clarendon files.

I have written the attached letter to my counterpart at NARS / Clarendon to get them accepted as Clarendon files.

I expect that FIC should be reimbursed for the payments it has made. The purpose of this e-mail is make you aware of that circumstance so that arrangements can be made to recover the money and properly account for it.

740069



**Frontier**
*INSURANCE COMPANY IN REHABILITATION*

195 Lake Louise Marie Road
Rock Hill, New York 12775-8000
(800) 836-2100 / (845) 796-2100

April 22, 2004

Mr. Harry Keith, Claims Examiner
North American Risk Services
P.O. Box 945055
Maitland, FL 32794-5055

Re:    Claimant:         Kevin Duesman (and Farmworth)
       Insured:          Jon Adamson, Jerel Adamson, Real/Pro, Inc. Realty Center
       Frontier Claim #:  74069

Dear Mr. Keith:

This letter refers to your June 21, 2002 (copy enclosed) regarding the suits against the Adamsons and the date of loss under the Frontier Claims Made Policy.

This letter addresses the claim made date, date of loss, for the Stewart/Watkins claim which was the first of these matters, and whether it falls before or after the 5/10/00 date of the cut thru endorsement (copy enclosed, fourth paragraph of your 6/21/02 refers).

I have re-examined the Stewart/Watkins documents. I find that the Complaint (copy enclosed) was filed May 24, 2000 and served according to Jon Adamson's report, on him 5/27/00 and Jerry's report, on him 5/25/00 (copies enclosed). Either date places the first making of the claim after the 5/10/00 cut thru.

Therefore, even if the damages alleged by Farmworth and Duesman arise out of the same or related errors as in Stewart/Watkins for purposes of limitation of damages (page 3 of the enclosed Frontier policy refers); and even they were sufficiently related to be deemed to have been made when the Stewart/Watkins claims were made (page 4 refers), that date falls after the 5/10/00 cut thru and therefore all are within the Clarendon coverage.

The Frontier Policy definition of "claim" (copy enclosed) requires a written demand for money or services, or the filing of suit or institution of arbitration proceedings.

The earlier Idaho Real Estate Commission administrative proceeding (copy enclosed) was initiated within, and as to events within the policy period for both Adamsons, (copy enclosed of policy effective date print-outs) was not a claim as defined in the policy. It did not include a written demand for money or services. It was not the filing of suit, nor was it the institution of arbitration proceedings. Accordingly, the date of loss for the earliest of these matters occurred when the claim was made after the May 10, 2000 cut thru date by the service of the Complaint, and that therefore, each of these matters fall within the Clarendon Coverage.



**Frontier**
INSURANCE COMPANY IN REHABILITATION

April 22, 2004
Claim # 74069
Mr. Keith
Page 2

I suspect that the reason that the correct date of loss was not discovered earlier was because the claim examiners originally handling it took the date of the transactions to be the "date of loss" rather than the claim made date.  The correct date of loss was not discovered until a more thorough file review was conducted.

I apologize for any inconvenience this delay may have caused.

As I will be retiring at the end of this month, Cheryl Smiley will be taking over this file.  You may reach her at (800) 836-2100 ext. 5061.  I will ask her to follow-up on the transmission of this file to you for further handling.

Very truly yours,

**JAMES M.  ESTABROOK, Esq.**
Senior Claim Examiner
GL Claim Dept
Ext 5020
jestabrook@ftr.com

JME/reg
0421:1-2

**James Estabrook - Re: 74069, 74071 Farnworth & Duesman**

| | |
|---|---|
| **From:** | James Estabrook |
| **To:** | Bill Schmidt; Cheryl Smiley; John Johnson; Kent Lombardi; Miike Donovan; Neal Conolly |
| **Subject:** | Re: 74069, 74071 Farnworth & Duesman |
| **CC:** | Frankie Bliss |

Bill, you are right. The expectation I expressed was that FIC should be reimbursed for the payments it has made, and that arrangements can be made to recover the money and properly account for it. What I failed to indicate when I said I had no information on the seeking of recovery, was that I have no information on any actual arrangements, either made or being made, to collect that money.

At the time all this was written, I assumed from the text of the "cut-thru" that Clarendon was a "pure vanilla" reinsurer. Since then Neal has shared his wish that neither this file, nor any other file be handled by Clarendon.

On being informed of that wish, I abandoned my assumption, and upon rumor, I formed a new speculation, suspicion and conjecture that: (1) Clarendon is working off of a trust fund or an escrow account, that (2) at the end of the day, FIC will share in any un-spent amount, and that (3) Neal probably believes that FIC can do a better job handling claims than Clarendon, thereby increasing the size of the un-spent amount to be returned to FIC.

However, I am not now, and never have been, privey to the Clarendon arrangements, I have no knowledge or information on the matter beyond Neal's wish.

>>> Bill Schmidt 04/28/04 10:11AM >>>
The recovery (such as it is) is referenced in paragraph 3 of your 1st e-mail, ie what Clarendon owes us, for a claim that they insured instead of us.

WKS

>>> James Estabrook 04/28/04 10:02AM >>>
WINS shows the payments were made on the dates, in the amounts, by the check numbers, and to the entities indicated in the attached.

I have no information on the seeking of recovery.

>>> John Johnson 04/27/04 03:05PM >>>
When were the payments made by FIC ? seeking recovery from ??

>>> Neal Conolly 04/22/04 06:23PM >>>
Notwithstanding the prior protocol, I don't want this or any other file handled by Clarendon.

Neal

>>> James Estabrook 04/22/04 17:13 PM >>>
As soon as Clarendon assumes further handling. The litigation is ongoing.

EXHIBIT
RR

about:blank                                                    4/28/04

>>> Bill Schmidt 04/22/04 04:48PM <<<

I was probably on vacation when that was decided. In any event, then this case should go to him not Cheryl, correct?

WKS

>>> Mike Donovan 04/22/04 03:52PM <<<

Bill,

Jody assumed the subro upon his return. He trained within Doreen for a full week before she left.

MD

>>> Bill Schmidt 04/22/04 03:10PM <<<

This raises a second point which (unless I was out of the loop if/when a decision was made) remains unresolved: ie, since the departure of Doreen Colon, what ever happened to all of our subrogation/recovery files (of which this case would be one)? Are we retaining a seperate unit here to do subrogation, or will each person who handled the underlying case continue to handle the recovery aspect? I think that whatever we do it should be consistent in all cases.

WKS

>>> James Estabrook 04/22/04 02:58PM <<<

Wins shows ~$98,000 in loss & defense payments on these two related files.

These claims were rejected by Clarendon as having dates of loss prior to the "cut thru". The correct dates of loss are after the 5/10/00 "cut thru", and they are therefore Clarendon files.

I have written the attached letter to my counterpart at NARS / Clarendon to get them accepted as Clarendon files.

I expect that FIC should be reimbursed for the payments it has made. The purpose of this e-mail is to make you aware of that circumstance so that arrangements can be made to recover the money and property account for it.

Claim 74069

| Trans Date | Amount | Check # | Vendor |
|---|---|---|---|
| 4/02/04 | $2,602.30 | 2601271 Q0338 | Kenneth L. Mallea, Esq |
| 3/27/04 | 1,825.50 | 2601268 Q0319 | Anderson, Julian & Hull, LLP. |
| 1/21/04 | 980.40 | 2601211 Q0319 | |
| 1/16/04 | 14,129.11 | 2601210 Q0328 | Quane Smith, LLP. |
| 1/16/04 | 602.90 | 2601209 Q0319 | |
| 11/21/03 | 542.83 | 2601122 G3238 | |
| 11/21/03 | 1,064.62 | 2601121 G3238 | |
| 10/28/03 | 3,724.70 | 2601084 Q0319 | |
| 10/28/03 | 573.46 | 2601083 G3238 | |
| 10/28/03 | 1,049.54 | 2601082 G3238 | |
| 10/28/03 | 222.50 | 2601081 Q0319 | |
| 10/23/03 | 5,535.83 | 2601075 Q0338 | |
| 10/21/03 | -5,535.83 | 2601044 Q0319 | |
| 10/17/03 | 577.41 | 2601052 G3238 | M & M Court Reporting Service |
| 10/17/03 | 546.78 | 2601051 G3238 | |
| 10/17/03 | 432.64 | 2601050 G3238 | |
| 10/17/03 | 869.79 | 2601049 G3238 | |
| 10/17/03 | 814.94 | 2601048 G3238 | |
| 10/17/03 | 436.59 | 2601047 G3238 | |
| 10/17/03 | 4,064.10 | 2601046 Q0319 | |
| 10/17/03 | 1,345.37 | 2601045 Q0328 | |
| 10/17/03 | 5,535.83 | 2601044 Q0319 | |
| 9/24/03 | 401.83 | 2600996 G3238 | |
| 9/24/03 | 397.86 | 2600994 G3238 | |
| 7/18/03 | 6,000.00 | 2600889 P5520 | Kevin Duesman and Angstman LAL PLLC, his attorneys |
| 7/11/03 | 882.28 | 2600880 G3238 | |
| 7/11/03 | 1,004.35 | 2600879 G3238 | |
| 7/11/03 | 497.99 | 2600878 G3238 | |
| 7/11/03 | 438.59 | 2600877 G3238 | |
| 7/10/03 | 433.59 | 2600876 G3238 | |
| 7/10/03 | 497.99 | 2600874 G3238 | |
| 7/09/03 | 6,612.80 | 2600870 G3238 | |
| 7/09/03 | 7,753.21 | 2600869 Q0319 | |
| 5/23/03 | 6,114.05 | 47150 | 1 ??? |
| 5/13/03 | 806.59 | 2600760 G4613 | Kinko's Inc |
| 4/30/03 | -619.61 | 2600716 G4613 | |
| 4/29/03 | 4,114.50 | 2600717 Q0338 | |
| 4/29/03 | 619.61 | 2600716 G4613 | |
| 3/20/03 | 367.15 | 2600648 B1642 | Givens Pursley, LLP. |
| 3/20/03 | 473.30 | 2600647 Q0319 | |
| 3/20/03 | 470.20 | 2600626 Q0319 | |
| 3/12/03 | 1,341.00 | 2600625 Q0319 | |
| 3/12/03 | 5,292.11 | 2600624 Q0328 | |
| 3/12/03 | 2,979.73 | 2600623 Q0328 | |
| 2/13/03 | 317.20 | 2600560 Q0319 | |
| 2/13/03 | 2,604.75 | 2600559 Q0338 | |
| 10/03/02 | 763.80 | 2600201 Q0319 | |
| | $92,608.40 | | $92,608.40 |

Claim 74071

| | | | | |
|---|---|---|---|---|
| 11/21/03 | 3,497.60 | 2601127 | Q0319 | |
| 4/29/03 | 315.00 | 2600715 | Q0319 | |
| 4/18/03 | 1,796.90 | 2600712 | Q0319 | |
| 10/19/02 | 165.00 | 2600282 | Q0338 | |
| | $5,774.50 | | | $5,774.50 |
| | | | | $98,382.90 |

EXHIBIT
SS



Frontier
INSURANCE COMPANY

A Subsidiary of Frontier Insurance Group, Inc.

P.O. Box 6709
Louisville, KY 40206-0709
(800) 637-7319 / (502) 897-1876
Fax: (502) 897-7174

June 8, 2001

Mr. Jerel H. Adamson
Real/Pro, Inc.
1921 Cleveland
Boise, ID 83705

Re:   Warren Farnworth v. Realty Center, Inc., et al.
      Case No. CV OC 0102482D
      Frontier Policy No. 98 EO 0003ID
      Frontier Claim No. 5085-AA

Dear Mr. Adamson:

This will confirm that Frontier Insurance Company (Frontier) has retained Karl Klein of Givens, Pursley LLC to appear on your behalf and defend you in this matter.

Section III, page 3 of the group policy provides:

All Claims arising out of the same or related errors, omissions or negligent acts will be deemed to have been made when the first of such Claims is made.

Frontier has determined that this lawsuit arises out of acts which are the same or related to the acts alleged in the *Stewart and Watkins* lawsuit.

Pursuant to the terms of the above group policy with Frontier, you will be expected to cooperate fully with Mr. Klein and Frontier in the defense of this matter.  Please forward copies of any important correspondence to us.  We also ask that you refer to the above-noted Frontier claim number on all correspondence.

We hereby agree to accept this tender of defense with a full reservation of, and without prejudice to, any and all rights which Frontier may have under the policy.  In addition, you have the right to appoint, at your own expense, personal counsel to advise and represent you regarding the matters that we believe are not covered by the policy.  Frontier will defend you for all claims made against you in this matter unless and until such time that Frontier's duties under the policy





Mr. Jerel H. Adamson
June 8, 2001
Page 2

are concluded. Frontier specifically reserves the right to withdraw from the defense of this matter, with due notice to you, in such an event.

The policy provides that you are responsible for the first $1,000.00 of any judgment, award, or settlement. Section 8, page 5 of the policy provides:

(a) The Insured shall be obligated to pay the Deductible amount as a result of all Damages arising out of the same or related errors, omissions or negligent acts of the Insured Licensee in the amount specified on the Declaration Page except to the extent that the Deductible may be increased by separate agreement between an individual Insured and the Company. The Company's obligation is to pay on behalf of the Insured Damages in excess of the Deductibles. The Deductible amount shall be tendered to the Company at the request of the Company.

Accordingly, you will only be charged one deductible for both the *Stewart and Watkins* claim and the instant claim.

Please be advised that Frontier reserves its rights as described in more detail below, but without limiting its right to assert additional grounds should those later become apparent.

The *Farnworth* lawsuit alleges:

36. On information and belief, the Defendants, and each of them, had actual knowledge that the Special Needs Family were being evicted for non payment of rent or had other information that would make it impossible for them to comply with the terms of the agreements and they negligently or intentionally withheld this information from Mr. Farnworth in order to keep the transaction from falling apart and to earn a commission or other fee.

The Second Count of the Complaint alleges violation of the Covenant of Good Faith and Fair Dealing. The Third Count alleges violation of the Idaho Consumer Protection Act and the Fifth Count alleges fraud. In addition, the Plaintiffs are seeking punitive damages and statutory penalties. At section VI, pages 8 and 9, the policy excludes from coverage those claims:

(a) arising out of a dishonest, fraudulent, criminal or malicious act, error, or omission, if committed by, at the direction of, or with the knowledge of the Insured;

(e) arising out of any injury or damage which is expected or intended by the Insured or which is the foreseeable result of an act or omission intended by the Insured;

(s) arising out of fines, penalties or punitive damages imposed by law;



Accordingly, Frontier hereby reserves its right to deny any claim relating to these exclusions or any other claim which is specifically excluded from coverage under the policy.

Our records indicate that you signed a Stipulation on September 20, 1999, admitting to certain violations of state law. Section V, subsection 11 of the group policy provides:

(c)    The Insured shall not admit any liability, make any payment, assume any obligation, or incur any expense related to such Claim or suit, except with the prior written consent of the Company.

Please be advised that Frontier reserves its right to deny any loss attributable to the admissions made in the Stipulation. Furthermore, section 1, Page 2 of the policy provides:

The Company will pay on behalf of the Insured Damages for which written Claim is first made during the Individual Policy Period. Such Damages must arise out of an error, omission or negligent act relating to the rendering of, or failure to render, Professional Services by an Insured . . .

At DEFINITIONS, pages 1 and 2, the policy provides:

8.    **Professional Services**

Professional Services means services performed by the Insured Licensee in the Insured Licensee's capacity as: a broker, associate real estate broker, salesperson, corporation or partnership as defined in the Idaho Real Estate License Law or in providing any other services for which the Insured Licensee must be licensed in accordance with the Idaho Real Estate License Law, not specifically excluded herein.

Accordingly, Frontier reserves its right to deny any loss attributable to actions outside the professional services covered by the policy.

As I advised you, we consider the *Farnworth* lawsuit and the *Stewart and Watkins* lawsuit to be related. The limit of liability for any one claim or related claims is $100,000.00 per insured licensee. The realty firm shares in this limit. Please be advised that Frontier will not be responsible for any judgment, award, or settlement in excess of that amount.

If you have any questions, concerns or knowledge of additional or different facts which would alter any of the positions stated herein, please do not hesitate to contact the undersigned at your earliest convenience.

Sincerely yours,

Maggie W. Knauss

Maggie W. Knauss
Claims Examiner

cc: Karl Klein, Esq.
Executive Director / IREC

FILE COPY

EXHIBIT
TT

Kevin Ford
375-6112
msg Phone

Rule
412

Homes for Everyone
PROGRAM
WHEN FAMILY CAN'T AND BANKS WON'T
BANKRUPTCY
NO CREDIT
SELF-EMPLOYED
SHORT TIME ON JOB
NO DOWN PAYMENT
FORECLOSURE
NEW IN AREA
JUST NO CREDIT AT ALL
WE CAN GET YOU IN YOUR NEW HOME
CALL KEVIN FORD OR SUSAN KNIGHT AT
867-4429 OR 368-9506
REAL PRO
THRIFTY NICKEL MAY 27 '99

Jon
Adamson -

His Judge
Judge
Hoy

**REAL/PRO FOUNDATION, INC, a non-profit corporation**

4406 Quail Point Court
Boise, Idaho 83703

October 22, 1999

R E C E I V E D
OCT 2 6 1999
IDAHO REAL ESTATE
COMMISSION

Ray Bixler, Investigator
Idaho Real Estate Commission
PO Box 83720
Boise, Idaho 83720

Dear Ray,

I write this letter as founder & director of the Real/Pro Foundation, Inc. and as associate broker and director of Real/Pro, Inc. dba Realty Center in response to a complaint filed June 16th of this year by the staff of the Idaho Real Estate Commission.

The two companies even though they have similar names and some of the directors sit on both boards are two separate companies and are quite different in what they do, how they operated, and why they exist.

The Real/Pro Foundation, Inc. is an Idaho non-profit organization. It is a church or religious lay ministry of Service Partners, Wealth Partners and staff (our leaders are trusted servants they do not govern) that try to show men of faith how they can use their financial resources to not only build a bright future for themselves but help the less fortunate achieve the American Dream of Home ownership. Its has an educational mission to educate our special needs families about the proper use of money and debt, and is dedicated to building a strong community through charitable giving (10% to 100% of all the service fees we collect are given to 501(3)(c) tax exempt charities).

Real/Pro, Inc. dba Realty Center does not own or operate the foundation. Some of its licensed real estate agents are approved marketing representatives or have been program directors for the foundation. All realtors are allowed to be apart of this organization and do receive a small remuneration as an independent contractor for calling on banks, savings and loans, housing authorities, prequalifying special needs families, etc.

In July the board added two paid employees to the staff, an Executive Director ( Jerel Adamson) and a Director of Charitable Giving.

In response to your complaint:

1) The *Truth Journal* is the official newsletter of the Real/Pro Foundation, Inc. It was ran as a public service announcement in the *Repo List* the official newsletter of Realty Center. It was sent first class mail to the subscribers of Realty Centers and members of the foundation. Its sole purpose was to educate and inform. As I told you in person, the foundation regrets the typo 503c this should have read 501(3)(c, we also should have made the pending IRS approval larger or used different wording all together so as not to create any confusion.

2) At the time the phase and disclaimer were used the foundation had in fact hired an attorney who specializes in working with the IRS to process our application. We felt we had supplied him with the needed information to complete the forms and to make the application.

3) The attorney's wife got pregnant with triplets and I became sick and the work has not yet been submitted. The foundation is currently working with two other non-profit organizations with similar missions (housing opportunities for men in recovery & housing opportunities for senior

EXHIBIT
UU

citizens not wanting to go into nursing homes) which have similar difficulties obtaining their 501(3)c status and as a back up plan we are working together with a Pocatello attorney that has promised to do the work for free.----------

4. None of the programs that have been shown to the *Wealth Partners* or as you call them Investors has required any of them to donate anything of monetary value to the foundation, or pay any service fees. The fact that they are willing to invest their time, talent and take a financial risk to help a strangers is donation enough. The foundation has screened, prequalified, educated, and underwritten up towards 250 people. I have only released three of the twelve programs that were given to me through divine revelation to the general public. All of the successful partnerships between wealth and need....or should I say... all that the foundation has currently received its service fee on were under the "Homes for Everyone" program. Under this program the Realtor would waive their commission for writing up the lease to own contract and the *Special Needs Family* would as part of their closings costs pay the foundation a service fee.

5. ATTACHED ( I believe all fees were through "Homes for Everyone")

6. Bob Chapman, CPA has the deposit book for the foundation as the service fees were collected they were to be referenced by the *Service Partner* (Realtors) trancode number.

I was asked to step down as President of the Foundation after the July Board meeting until my partnership was restored, also in July the board of Realty Center made me give up being Designated Corp. Broker. He has finished his audit of service fees collected and I have attached it for your review.

7. Through the end of July combined service board meetings of the two corporations were held usually at least 3 times per week at the Realty Center offices at 2419 W. State, Boise. the *"Twelve Steps to Financial Freedom Workshops"* and a general fellowship & board meeting were held each month through the end of July at the Ameritel Inn. The Idaho Real Estate Commission was invited to the June & July workshops but I believe you declined. Even though the August workshop was paid for, Jerel Adamson did nothing as Executive Director to make sure the workshop or board meeting happened as planned.

I have already given the commission a copy of the Serenity Bible which incorporates the Judeo-Christian beliefs and Twelve Steps that this foundation is built upon. Further I do remember giving you the AA Service Manual (which is currently used by over 77 non-profit organizations) which discusses the twelve traditions, the twelve concepts of service, and the third legacy as to voting & membership all of which have been adopted by the foundation.

The most recent copy of the *Truth Journal* is attached for your review. It has not yet been sent out so if you see anything you or the commission might find objectionable please call as soon as possible.

In March of this year, HUD gave nearly 4 million dollars in grants to the Boise Neighborhood Housing and to Boise City Housing to help approximately 20 people in their lease to own programs. I do not have the exact number of people helped by our foundation but I am sure it is more than twenty. I never received any compensation as director, president, or for any of the radio shows or seminars. Most of the service fees are just commissions that Realty Center could of charged but didn't. We were also able to give several thousand back to local charitable organizations (the Botanical Gardens, Christian Radio, The Boise Art Museum, Hospice of St. Lukes, Nampa Homeless Project and more)

It is my prayer that you will know that the actions of a few should not force this ministry to be abandoned.

Sincerely,

Jon D. Adamson

RECEIVED

OCT 26 1999

IDAHO REAL ESTATE COMMISSION

RECEIVED
OCT 2 6 1999
IDAHO REAL ESTATE COMMISSION

Phone 1-800-304-7186
Fax 1-208-385-7311

# *good shepherd* (The Homes for Everyone Program)

Under this program the Real/Pro Foundation, Inc., through the charitable support of the *Wealth Partner* in the form of investment capital & credit, and the technical support of one of the foundations *Service Partners* who is willing to make a 90% non-owner occupied loan. The foundation arranges special lease to own financing for our *Special Needs Family* which gives them the down payment and closing costs over a 1-3 year time span. The *Special Needs Family* is any family who can afford a home but is unable to qualify for new financing on their own because they have been unable to save up enough money, have less then perfect credit, self-employed, recent medical bankruptcy, lack of time on the job, etc.

## How the program works

### *Wealth Partner* {Investor, family, property owner}

The *Wealth Partner* buys the home for the *Special Needs Family* and sells it back to the *Special Needs Family* under a real estate contract that allows for special lease to own financing that guarantees a fair price in todays real estate market, rights to future appreciation, accelerated equity build-up (4-5 times greater than simple interest note), and an early closing bonus should the *Special Needs Family* be able to sell the property for a profit or be able to refinance after one year into the program. The *Wealth Partner* receives the tax deduction from depreciation, and other tax write-offs, small monthly cash-flow to help in their retirement planning, and the ability to have their small 10% investment return a hundred fold blessing. At the end of this program the *Wealth Partner* can use a 1031 tax-deferred exchange to avoid their tax liability on their tax gain and be in a position to help two *Special Needs Families* in the future with the same original investment!

**Cost:** The foundation charges a $1000 service fee which is part of the closing costs of the home purchase and may be paid by the buyer, seller, Realtor, builder, etc. This fee may be tax deductible as closing costs (10% is given back to local charities, 30% goes to salaries and administrative expenses for the foundation and 60% is given back to the *Service Partners* for their help and to cover the extra expenses they incur: i.e. Realtor to write lease to own contract and mortgage banker to underwrite future credit worthiness and to pull current credit report to determine if *Special Needs Families* will be able to fulfill the contract. **Matthew 18: 10-20**

RECEIVED

OCT 25 1999

IDAHO REAL ESTATE
COMMISSION

*The Truth Journal*  Real/Pro Foundation, Inc.

The Real/Pro Foundation, Inc. is an Idaho non-profit corporation that provides home ownership opportunities to families that do not presently qualify for traditional mortgage financing because of lack of down payment, recent bankruptcy, self-employment, or lack of time on the job. If family is unable to help and banks can't because of lending regulations... we can help!  In addition to finding a home for our *Special Needs Family* (may be another non-profit organization) the foundation provides on going workshops to teach people to use money and debt as a tools to more abundant living. The *Special Needs Families are a vital* part of our fellowship they help in election of representatives which elects a trustee that serves a 2 year term on our board of directors

### About the workshops

The workshops are part of the foundations educational and religious out reach. They are free of charge and open to the general public. The workshops show our *Wealth Partners* how basic Judeo-Christian principles such as *honesty, hope, faith, courage, integrity, and willingness* when combined with innovative economics and sound real estate investing can offer them good retirement incomes while helping people unable to participate in the American Dream of Home Ownership! The workshops help the *Wealth Partners* develop win-win programs that meet all of the needs of the *Special Needs Family*. *Low-down payment loans and 1031 tax-deferral allows their assets to increase 100% every 3-5 years allowing their giving capacity to increase as well over time.* There is a free workshop every month ( a business meeting of the *Approved Marketing Representatives, Wealth Partners,* and *Service Partners* is held prior to the workshop once each quarter, and a fellowship and/or business meeting of our *Special Needs Families (nonprofit),* and representatives of the *Approved Charities* once each quarter)

# GOD - The Foundation - common sense

**The Vision-** That money is a blessing from GOD. That mankind places more faith in money and the things it can buy, i.e. homes, cars, trips, *security* (the ability to take care of oneself) than faith in GOD. It is our vision that GOD through faith (giving first then receiving) is ready, willing and able to bless everyone with more than just monetary riches but with *financial freedom* (the ability to help others).

**Our Motto-** "If we are faithful there will never come a time that we can not be charitable. If we fail then we fail GOD".

# 12 steps -traditions-concepts-principals and programs plus 10 commandments and 2 suggestions

Our founder Jon Adamson, a successful real broker, developer, appraiser, and mortgage lender, has suffered with chronic pain associated with several disabling conditions including his back being fused together with a metal rod since the age of thirteen. He home schooled himself, barely twenty, sold his way into banking where he learned many of the secrets to making money. He coupled that banking knowledge with a $25,000 loan from his parents, $2,500 from scholarship money, some innovative economics that he learned from his mother, the ability to see into the future which he acquired from his father, and Jon was very wealthy before he was old enough to be wise. Jon has always believed his success came through knowledge (he read the complete World Book Encyclopedia as a youngster) and following the footsteps of famous men and heroes ( his best examples were his father who died and is now in Heaven - Warren Adamson and what he has read about Moses, and Jesus Christ).

To make a long terribly personal story short! Our founder would like history to remember him as a man of science and when confronted with the stark reality that his love of fine wines and his inability to control his physical pain with doctor prescribed pain killers led to a much worse disease, *alcoholism* ( the addiction to alcohol). He was able to stop the pills on his own with the doctors help but the addiction would require being admitted to a treatment facility which would have costs thousands of dollars not only in treatment but lost wages. Because of his pre-existing conditions medical insurance was not available. The treatment centers would not give a money back guarantee so he had to find another way. He went to the library looked up recovery-alcohol *Alcoholics Anonymous* Author, colal bill wilson. He called the number for AA in the telephone book, went to a meeting.

RECEIVED
OCT 24 1999
IDAHO REAL ESTATE
COMMISSION

was given a big book, invited to come back; he did and since July 1991 he has not had a drink.

The Twelve Steps as taught in AA helped Jon overcome many of his fears of life and some of his selfish behavior and as a result Jon not only did not drink but his life became richer not only in money but other relationships including his relationship with GOD. As Jon gave back to the fellowship of AA by holding different service positions he learned the power of the Twelve Traditions and Twelve Concepts of Service. He learned that these traditions and concepts allowed a huge organization to be ran by a group of drunks willing to take Good Orderly Direction back into their lives. When he applied these Principles to his work place it ran smoother and was more profitable. In working with other recovering alcoholics Jon discovered not the principals of the AA program were the spiritual principals behind the Spiritual Laws of the Ten Commandment and **The Two Greatest Commandments ( love god with all your heart and to love others as your brothers and sisters)**

Jon Adamson was born dead on July 7, 1953 at Saint Benedictines Hospital in Jerome, Idaho. The nuns had read of resent advancements in resuscitation techniques used during the Korean War. They prayed, did heart massage, and injected him with a stimulant in the left leg which has left its mark to this day, but he lived. The Priest of the hospital immediately baptized Jon a Roman Catholic in fear that he still might die. Jon's family was LDS so he was raised in the Mormon faith. At 13 years of age while at the Primary Children's Hospital in Salt Lake City after under going eighteen hours of surgery and weeks of drug induced coma his heart stopped. He says he left his physical body and in a spiritual body saw everything around him including the nurses and doctors cutting off his body cast. After he says he felt a sense of peace, joy and love he has never since experienced. After seeing the light and being sent back Jon was active in several youth ministries

College, starting a career, a wife, a family, the ups and downs of every day living, and days filled with unending chronic pain changed Jon. He say's, "living began to take the life out of me". At 34 the doctors told Jon he had only six months to live. The alcohol, pain pills, depression, and anxiety had finally caught up with him. He found AA and started rebuilding his life through service to God and his fellow man. He was taught the wise and righteous ways of the Old Testament by his business partner of many years the jay rabbi for Beth Israel Temple in Boise, Robert Hamersley who told him the only requirement for membership in to the Jewish faith was to believe in and follow one god. Jon has always found good in all religion, he became what he like to call himself "a Jew for Jesus".

The first year of Jon's sobriety, he talks of two profound spiritual experiences. The first happened at a meeting where he had been asked to read a portion of chapter

RECEIVED
OCT 26 1999
IDAHO REAL ESTATE...

5. "How it Works", at the end of the passage are the ABC's of the program of recovery." He say's that as he read *no human power could relieve us of our alcoholism*... he said a silent prayer. *Oh God help me I can not do this alone!* He says that at that moment time stood still, the room was filled with light and the word of God blew through him. He says that he was filled with inspiration, that he was not alone and that God had a purpose and a plan for his life! The second experience came after a marital disagreement about how much time he was devoting to helping other and not at home, with his family, Jon says he stormed out of the house. I'll show you he thought, I'll get drunk. As he turned into the liquor store a loud powerful voice from nowhere said "*WHERE IS YOUR GRATITUDE!*" He did not drink, and from that day forword he has maintained his sobriety by placing God first, helping the less fortunate, and loving his wife & family.

Eight years pass and Jon is taking a hot relaxing bath on a Saturday before his syndicated radio show "*Property Line Today*". He says he was in the middle of his eleventh step prayer and meditation when the power of the Holy Ghost fell upon him. He was told to deliver a great message and given a vision of the future. A future of the rich helping the poor, and the great blessings, that God had in store for all men of faith!

The foundation subscribes to HUD's Equal Housing Opportunity Guidelines and tries/does not discriminate and is a supporter of Fair Housing. GOD is of your understanding and belief or as Jon sometimes puts it **Good Orderly Direction**. Jon Adamson our founder says **the Twelve Programs, The Vision, The** **Our Motto** were given to him by inspiration from the Holy Spirit and **The Holy Word**. The highlighted items form the solid rock foundation the Real/Pro Foundation has been given.

About our Co-founder, Linda Adamson, she has devoted her life to helping the sick and dying. She is one of the original volunteers of the St. Lukes Hospice. Her husband Jon says that Linda is owed all the credit for the foundation. She is the one who has had to make the real sacrifices, Linda has watched Jon work. similar miracles for people before he found GOD, so she is not so much impressed She believes in doing good for good causes, and good people. She believes faith without works is dead. Her years of supporting the community has lead to the **Twelve Annual Charitable Causes** and **144 Active Charities**. All money received in the from of service charges for its religious and educational pursuits. 10% goes to one of our twelve annual causes which are IRS tax exempt charities. in our community plus all of our *Service Partner's* who receive compensation from the foundation have agreed that 10% of their remuneration can be sent to one of the 144 active charities. Plus any year end profit is also donated.

RECEIVED
OCT 2 1999
IDAHO REAL ESTATE COMMISSION

PER FOUNDATION DEPOSIT BOOK
SERVICE FEES COLLECTED ("HOMES FOR EVERYONE")

| S/P | TRANSCODE | SNF | AMOUNT | DATE |
|---|---|---|---|---|
| RLTY CTR | 93-99-JA | SWORD | #500 | 5-22-99 |
| " | 87-99-JA | PALMER | # 500 | 5-22-99 |
| " | 86-99-JA | JONES | # 500 | 5-22-99 |
| " | 96-99-JA | BAILEE | 1,000 | 8-10-99 |
| " | 126-99-JA | PAYNER | 1,000 | 8-24-99 |
| " | 95-99-JA | YARBOROUGH | 250 | 8-24-99 |
| " | 96-99-JA | LYONS | 500 | 8-24-99 |
| " | 116-99-JA | GOOLD | 1,000 | 8-24-99 |
| " | 118-99-JA | VINDINHA | 1,000 | 8-24-99 |
| " | 125-99-JA | SANEKI | 1,000 | 8-24-99 |
| " | 109-99-JA | DUBY | 1,000 | 8-24-99 |
| " | 101-99-JA | DARRACH | 1,000 | 8-24-99 |
| " | 107-99-JA | PHILIPS | 1000 | 8-24-99 |
| " | 67-99-JA | ZANDERS | 800 | 8-24-99 |
| " | 123-99-JA | CAMPBELL | 500 | 8-24-99 |
| " | 66-99-JA | *GREITING | 500 | 8-24-99 |
| " | (NO TRAN CODE) | PACKER | 200 | 8-24-99 |
| " | 66-99-JA | *GREITING | 500 | 9-13-99 |

ALL OF THESE SHOULD HAVE BEEN #1,000 SOMEONE AT REALTY CENTER WAS RECKLESS WITH COLLECTING MONEY OWNED REAL/PRO FOUNDATION, INC. WE ARE ALSO DOING AN INVESTIGATION AS TO FEES THAT MAY HAVE PURPOSEFULLY MISDIRECTED OR NOT COLLECTED, BY EITHER KEVIN FORD OR JEREL ADAMSON

SERVICE FEE — ("GOOD NEIGHBOR")

" 74-99-JA SAGE (JERRY DID NOT COLLECT SERVICE FEE?)

FOUNDATION DID RECEIVE NOTE + 2ND DOFT WHICH WILL BE DONATED TO CHARITY

[redacted]